[No. B209964. Second Dist., Div. Six. June 15, 2009.]

FLIR SYSTEMS, INC., et al., Plaintiffs and Appellants, v. WILLIAM PARRISH et al., Defendants and Respondents.

## COUNSEL

Latham & Watkins, Daniel Scott Schecter, Charles Courtenay, Svetlana Berman; Bickel Brewer, William A. Brewer III and James S. Renard for Plaintiffs and Appellants.

Wilson, Sonsini, Goodrich & Rosati, James A. DiBoise and Charles Tait Graves for Defendants and Respondents.

## OPINION

**YEGAN, P. J.**—Appellants FLIR Systems, Inc. (FLIR), and Indigo Systems Corporation (Indigo) appeal from a judgment and postjudgment order awarding respondents William Parrish and Timothy Fitzgibbons $1,641,216.78 in attorney fees and costs in a trade secret action. (Civ. Code, § 3426 et seq.)[1]

---

[1] Unless otherwise stated, all statutory references are to the Civil Code. California's Uniform Trade Secrets Act (Civ. Code, § 3426 et seq.) states: " 'Trade secret' means information, including a formula, pattern, compilation, program, device, method, technique, or process, that: [¶] (1) Derives independent economic value, actual or potential, from not being generally known to the public or to other persons who can obtain economic value from its disclosure or use; and [¶] (2) Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy." (§ 3426.1, subd. (d).)

The trial court found that the action was filed and maintained in bad faith within the meaning of section 3426.4 of the Uniform Trade Secrets Act. We affirm.

*Facts*

Indigo manufactures and sells microbolometers. A microbolometer is a device used in connection with infrared cameras, night vision, and thermal imaging. A significant portion of Indigo's technology was created by respondent William Parrish. FLIR manufactures and sells infrared cameras, night vision, and thermal imaging systems that use microbolometers. In 2004, FLIR purchased Indigo for approximately $185 million, acquiring Indigo's patents, technology, and intellectual property. Parrish and Fitzgibbons were shareholders and officers of Indigo before the company was sold. After the sale, they continued working at Indigo.

In 2005, respondents decided to start a new company to mass produce bolometers and gave notice that they would quit Indigo on or about January 6, 2006. The new company was based on a business plan (Thermicon) developed by Fitzgibbons in 1998 and 1999 when he was self-employed.

Before leaving Indigo, respondents discussed allowing appellants to participate in Thermicon. Respondents proposed outsourcing bolometer production to a third party. The production startup time would be quick, assuming respondents could acquire technology licenses and intellectual property from a third party. Respondents offered FLIR a noncontrolling interest in Thermicon. FLIR rejected the offer and wished respondents success in the new endeavor.

In early 2006, respondents entered into negotiations with Raytheon Company to acquire licensing, technology, and manufacturing facilities for Thermicon. Respondents assured appellants they would not misappropriate Indigo's trade secrets and that the new company would use an intellectual property filter similar to the one used at Indigo to prevent the misuse of trade secrets.

Fearful that the new business would undermine FLIR's market, appellants sued for injunctive relief and damages on June 15, 2006. The action was premised on the theory that respondents could not mass produce low-cost microbolometers based on the Thermicon time line without misappropriating trade secrets.

Upon learning of the lawsuit, Raytheon Company terminated business discussions with respondents. On August 15, 2006, respondents advised appellants that they were not going forward with the new business.

*The Permanent Injunction Trial*

Appellants dismissed the damage causes of action and proceeded to trial for a permanent injunction to enjoin respondents from (1) making use of appellants' trade secrets in the design, manufacture, and high-volume production of uncooled vanadium oxide microbolometers; (2) selling uncooled vanadium oxide microbolometers in commercial markets less than 12 months after respondents entered into a license with Raytheon Company or any other third party to purchase intellectual property; or (3) using, disclosing or misappropriating the contents of an Indigo commodity code database that Parrish attempted to download while an employee at Indigo.

After eight days of testimony, the trial court found no misappropriation or threatened misappropriation of trade secrets. It was uncontroverted that respondents received no funding for Thermicon, did not start a new business, had no employees or customers, did not lease a facility or develop technology, and did not design, produce, sell, or offer to sell infrared products.

In a 25-page well-reasoned statement of decision, the trial court found that the action was brought in bad faith based on a theory of "inevitable disclosure," a doctrine not recognized by California courts because it contravenes a strong public policy of employee mobility that permits ex-employees to start new entrepreneurial endeavors. (See *Continental Car-Na-Var Corp. v. Moseley* (1944) 24 Cal.2d 104, 110 [148 P.2d 9]; *Whyte v. Schlage Lock Co.* (2002) 101 Cal.App.4th 1443, 1462 [125 Cal.Rptr.2d 277].) Appellants were ordered to pay $1,352,000 in attorney fees and $289,216.78 in costs. (§ 3426.4.)

*Section 3426.4 Fees: Trial Rules and Appellate Rules*

Section 3426.4 of the Uniform Trade Secrets Act provides: "If a claim of misappropriation is made in bad faith, . . . the [trial] court may award reasonable attorney's fees and costs to the prevailing party." Although the Legislature has not defined "bad faith," our courts have developed a two-prong standard: (1) objective speciousness of the claim, and (2) subjective bad faith in bringing or maintaining the action, i.e., for an improper purpose. (*Gemini Aluminum Corp. v. California Custom Shapes, Inc.* (2002) 95 Cal.App.4th 1249, 1262 [116 Cal.Rptr.2d 358] (*Gemini*).) Section 3426.4 authorizes the trial court to award attorney fees as a deterrent to specious trade secret claims. (95 Cal.App.4th at p. 1261.) Because the award is a sanction, a trial court has broad discretion in awarding fees. (*Id.*, at p. 1262.)

On appeal from such an order, the appellant has an "uphill battle" and must overcome both the "sufficiency of evidence" rule and the "abuse of discretion" rule. We need not repeat these well-settled rules. (See *Estate of Gilkison*

(1998) 65 Cal.App.4th 1443, 1448–1450 [77 Cal.Rptr.2d 463].) As we shall explain, appellant does not appear to appreciate the trial court's factfinding power and its discretionary power to award attorney fees and costs to curtail a bad faith claim of trade secret misappropriation. We do not retry cases on appeal and we do not substitute our discretion for that of the trial court.

### Objectively Specious

■ Appellant argues that the first prong, i.e., objective speciousness, was not satisfied. Objective speciousness exists where the action superficially appears to have merit but there is a complete lack of evidence to support the claim. (*Gemini, supra,* 95 Cal.App.4th at p. 1261; *CRST Van Expedited, Inc. v. Werner Enterprises* (9th Cir. 2007) 479 F.3d 1099, 1112.)

The trial court found that the action was objectively specious because appellants suffered no economic harm and there was no misappropriation or threatened misappropriation of trade secrets. It also found that respondents did not misappropriate the idea of outsourcing microbolometer production to a third party and that the Thermicon business plan, which included a business forecast chart, did not misappropriate confidential information from appellants.

Objective speciousness was established by evidence that appellants had an anticompetitive motive in filing the lawsuit. When asked why the action was filed, FLIR CEO Earl Lewis testified that "we can't tolerate a direct competitive threat by Bill [Parrish] and Tim [Fitzgibbons]." Lewis had no evidence of wrongdoing but was bothered that respondents planned to compete with FLIR in the future.

■ Appellants argue that attorney fees may not be awarded unless the action is "frivolous," an objective standard used to impose Code of Civil Procedure section 128.5 sanctions. But the word "frivolous" does not appear in section 3426.4. "[S]ection 3426.4 requires objective speciousness of the plaintiff's claim, as opposed to frivolousness . . . ." (*Gemini, supra,* 95 Cal.App.4th at p. 1262.)

■ The evidence here supports the finding that appellants filed a specious action as a preemptive strike and for an anticompetitive purpose. The complaint alleges that appellants suffered "actual damages" and that respondents willfully and maliciously converted appellants' trade secrets "with the deliberate intent to injure [appellants'] business . . . ."[2] The evidence,

---

[2] The complaint alleges that Fitzgibbons, at a July 2004 board presentation to partner with FLIR, "effectively claimed ownership of FLIR's trade secrets" and "stated his intentions to

however, showed no "actual damages," misappropriation, or threatened misappropriation of trade secrets, and no threat of imminent harm.

■ The trial court ruled that the action was based on the doctrine of "inevitable disclosure" and violated public policy favoring employee mobility. (Bus. & Prof. Code, § 16600; *Metro Traffic Control, Inc. v. Shadow Traffic Network* (1994) 22 Cal.App.4th 853, 859 [27 Cal.Rptr.2d 573]; *Bayer Corp. v. Roche Molecular Systems, Inc.* (N.D.Cal. 1999) 72 F.Supp.2d 1111, 1119–1120.)[3] The doctrine of inevitable disclosure is not the law in California. (*Whyte v. Schlage Lock Co., supra*, 101 Cal.App.4th at p. 1447 [inevitable disclosure injunction not permitted].) Sixty years ago our Supreme Court in *Continental Car-Na-Var Corp. v. Moseley, supra*, 24 Cal.2d at page 110, stated: "A former employee has the right to engage in a competitive business for himself and to enter into competition with his former employer, even for the business of those who had formerly been the customers of his former employer, provided such competition is fairly and legally conducted. [Citation.]"

Appellants admitted that respondents had the right to leave Indigo but claimed that respondents would misappropriate trade secrets if they started a new company. But speculation that a departing employee may misappropriate and use a trade secret in a startup business will not support an injunction. (*Continental Car-Na-Var Corp. v. Moseley, supra*, 24 Cal.2d at pp. 107–108 [injunction may not issue based on employer's speculation]; *GlobeSpan, Inc. v. O'Neill* (C.D.Cal. 2001) 151 F.Supp.2d 1229, 1235 [same].) "A trade secrets plaintiff must show an actual use or an actual threat." (*Bayer Corp. v. Roche Molecular Systems, Inc., supra*, 72 F.Supp.2d at p. 1120.)

Missing here is evidence of misappropriation, threatened misappropriation, imminent harm, or ongoing wrongdoing. William Sundermeier, president of a FLIR division, voted with FLIR CEO Lewis to file the lawsuit but had no

proceed with a competing business based on such ideas, plans and information . . . ." The complaint states that appellants were concerned about respondents' "brazen plan to use FLIR's confidential trade secrets" and that respondents willfully and deliberately breached noncompete agreements and proprietary agreements. None of these allegations were proven.

[3] "Under the doctrine of inevitable disclosure, 'a plaintiff may prove a claim of trade secret misappropriation by demonstrating that defendant's new employment will inevitably lead him to rely on the plaintiff's trade secrets.' (*PepsiCo, Inc. v. Redmond* (7th Cir. 1995) 54 F.3d 1262, 1269 (*PepsiCo*).) The inevitable disclosure doctrine results in an injunction prohibiting employment, not just use of trade secrets. The doctrine's justification is that unless the employee has 'an uncanny ability to compartmentalize information' the employee will necessarily rely—consciously or subconsciously—upon knowledge of the former employer's trade secrets in performing his or her new job duties. [Citation.]" (*Whyte v. Schlage Lock Co., supra*, 101 Cal.App.4th at pp. 1458–1459.)

personal knowledge that respondents had committed a wrongful act. At trial, Sundermeier could not say why the lawsuit was still ongoing a year and a half later.

### Subjective Bad Faith

█ Subjective bad faith may be inferred by evidence that appellants intended to cause unnecessary delay, filed the action to harass respondents, or harbored an improper motive. (*Gemini, supra,* 95 Cal.App.4th at p. 1263.) The timing of the action may raise an inference of bad faith. (*Id.,* at pp. 1263–1264.) Similar inferences may be made where the plaintiff proceeds to trial after the action's fatal shortcomings are revealed by opposing counsel. (*Id.,* at p. 1264.)

Appellants suspected that trade secrets would be misappropriated and claim that a reasonable suspicion is evidence of good faith.[4] The trial court did not credit this theory, instead finding that appellants' reasons for bringing and maintaining the action were "inevitable disclosure" arguments. " 'In reviewing the facts which led the trial court to impose sanctions, we must accept the version thereof which supports the trial court's determination, and must indulge in the inferences which favor its findings. [Citations.]' [Citation.]" (*Gemini, supra,* 95 Cal.App.4th at pp. 1262–1263.)

### Hard Drive Download

Appellants contend there was a threatened misappropriation of trade secrets because Parrish downloaded technological data onto a portable hard drive before leaving Indigo. The information was stored on Indigo's computer network in a commodity code database for employee access.

Working on a project at Indigo, Parrish was frustrated about the slow computer network and copied the database to work at home. Parrish tried to use the hard drive but discovered that the database hyperlinks were broken and the data was not readable. Parrish left the hard drive at home and destroyed it in the spring of 2006 before the lawsuit was filed.

Parrish told Jim Woolaway, FLIR's chief intellectual property officer, about the download several months after the lawsuit was filed. Woolaway reported

---

[4] The statement of decision states that respondents, by their words or conduct, did not threaten imminent misuse of appellant's trade secrets or threaten immediate harm, "although the conduct of both of them raised a reasonable suspicion that they might misuse [appellants'] trade secrets." Appellants argue that "reasonable suspicion" bars a finding of subjective bad faith. The trial court correctly ruled that "reasonable suspicion" was not enough and that appellants were suing on an inevitable disclosure theory to prevent respondents from competing with FLIR.

the incident to his superiors. Thomas Surran, an Indigo executive, thereafter attempted to download the database on a hard drive and confirmed the hyperlinks did not work.

The hard drive download was not a consideration in bringing the action because appellants first learned of it after the complaint was filed. The trial court found that the download was not a threatened misappropriation because there was no evidence that the contents of the hard drive, "if such contents existed, were improperly accessed, used, or copied before the drive was destroyed."

■ Appellants claim that the hard drive download is a "threatened" misappropriation under the Uniform Trade Secrets Act. This is a restatement of the inevitable disclosure doctrine which is not the law in California. (*Whyte v. Schlage Lock Co., supra*, 101 Cal.App.4th at pp. 1463–1464; Trade Secrets Practice in Cal. (Cont.Ed.Bar 2d ed. 2008) § 12.13, p. 486.) The trial court, in construing section 3426.2, properly found that a "threatened misappropriation" means a threat by a defendant to misuse trade secrets, manifested by words or conduct, where the evidence indicates imminent misuse. (See, e.g., *Central Valley General Hospital v. Smith* (2008) 162 Cal.App.4th 501, 527 [75 Cal.Rptr.3d 771] [imminent threat of misuse based on defendant's possession of trade secrets and prior misuse].)

Under appellants' construction of the law, an employer could bring a trade secret action after an employee downloads a company document and deletes the document from his or her laptop computer at home. A similar action could be brought where company messages are left on the employee's e-mail or phone answering machine and deleted after the employee changes jobs.

■ The Uniform Trade Secrets Act requires an "[a]ctual or threatened misappropriation . . . ." (§ 3426.2, subd. (a).) Mere possession of trade secrets by a departing employee is not enough for an injunction. (*Central Valley General Hospital v. Smith, supra*, 162 Cal.App.4th at pp. 528–529; Trade Secrets Practice in Cal., *supra*, § 12.13, pp. 484–485.) " 'A trade secret will not be protected by the extraordinary remedy of an injunction on mere suspicion or apprehension of injury. There must be a substantial threat of impending injury before an injunction will issue . . . .' [Citations.]" (*Del Monte Fresh Produce Co. v. Dole Food Co., Inc.* (S.D.Fla. 2001) 148 F.Supp.2d 1326, 1338 [discussing California and Florida law].)

Where the trade secrets plaintiff seeks a permanent injunction, section 3426.2, subdivision (c) "authorizes only injunctions that compel 'affirmative acts.' " (*Central Valley General Hospital v. Smith, supra*, 162 Cal.App.4th at

p. 530.) It authorizes mandatory, not prohibitory injunctions, i.e., " 'mandatory injunctions requiring that a misappropriator return the fruits of misappropriation to an aggrieved person . . . .' [Citation.] An order enjoining a remote threat of misuse or disclosure is prohibitory and does not necessarily compel affirmative acts. Thus, such an injunction is not authorized by subdivision (c) of section 3426.2." (*Ibid.*; see Trade Secrets Practice in Cal., *supra*, § 12.13, p. 485.)

Although the complaint was for a permanent injunction, appellants did not seek an order compelling respondents to return anything. The hard drive was destroyed prior to trial. Respondents could not return anything because no trade secrets were misappropriated. "All that is alleged, at bottom, is that defendants could misuse plaintiff's secrets, and plaintiffs fear they will. That is not enough." (*Teradyne, Inc. v. Clear Communications Corp.* (N.D.Ill. 1989) 707 F.Supp. 353, 357.)

Subjective bad faith was established by the contradictory testimony of appellants' executives who did not want to take responsibility for initiating and maintaining the action. Appellants' managers and employees testified that respondents were trustworthy, would not do anything wrong, and should have been allowed to start a new company.

### Patent Applications

Appellants argue that Parrish's objections to two Indigo patent applications created a reasonable suspicion that he would misappropriate trade secrets. Parrish held 25 patents and was the inventor of 11 or 12 patents while employed at Indigo.

After quitting Indigo, Parrish learned that appellants were submitting patent applications on a packaging and manufacturing process that he had worked on. Parrish told Woolaway, FLIR's chief intellectual property officer, that the patent applications were not valid. At trial, appellants claimed that Parrish's objection to the patent applications caused them to believe that trade secrets might be misappropriated.

Woolaway, who authored the patent applications, stated that the United States Patent & Trademark Office could go either way on the validity of the applications. Woolaway was concerned about Parrish's remarks but did not believe Parrish would steal or misuse appellants' intellectual property. This testimony was echoed by appellants' officers and managers who stated that respondents were trustworthy and that an inventor's disagreement about a patent application did not signal a plot to steal trade secrets. The trial court

reasonably concluded that Parrish's objections to the patent applications were not threatened misappropriations of a trade secret.

## Trade Secret Experts

The trial court factually found that appellants maintained the action in bad faith with expert testimony that lacked a scientific basis and failed to address the possibility that respondents could lawfully acquire technology from Raytheon Company. Appellants claimed that respondents' plan to work with Raytheon Company was a contrivance and that Raytheon did not have the technology for mass-producing microbolometers. The trial court found that respondents' testimony, the testimony of a Raytheon official, and the Raytheon negotiation documents were credible and unrebutted. It concluded that the "contrivance" argument was asserted in bad faith to bolster a groundless action.

Subjective bad faith was also established by appellants' failure to identify what trade secrets would be subject to the permanent injunction. Appellants' experts testified that appellants had a mix of trade secrets and nonsecret information and that no list was prepared to identify the trade secrets. The trial court found that the proposed injunction was overbroad, did not give notice as to what was forbidden, and would harm respondents' reputation in the business community. (See, e.g., *MAI Systems Corp. v. Peak Computer, Inc.* (9th Cir. 1993) 991 F.2d 511, 522–523 [permanent injunction failed to identify trade secrets with reasonable specificity]; *Advanced Modular Sputtering, Inc. v. Superior Court* (2005) 132 Cal.App.4th 826, 836 [33 Cal.Rptr.3d 901] [more particularity required in describing trade secrets in highly specialized technical field]; Trade Secrets Practice in Cal., *supra*, § 12.8, p. 476.) Among other things, the proposed injunction barred respondents from developing certain products for a 12-month period even if respondents did not use appellants' technology or trade secrets. It was an unlawful restraint on trade (Bus. & Prof. Code, § 16600) and strong evidence of subjective bad faith.

## Bad Faith Settlement Tactics

The trial court further found that appellants maintained the action in bad faith by imposing unnecessary settlement conditions. In a July 14, 2005 settlement letter, respondents described their plan to acquire technology from a third party, restated that they would not misappropriate appellants' trade secrets, attached copies of Fitzgibbons's Thermicon business plan, and agreed to have a third party monitor and review the technology that respondents would develop. Appellants responded with the demand for $75,000, a non-competition agreement, and an agreement that respondents would not hire appellants' employees or challenge Indigo patent applications.

Woolaway, FLIR's chief intellectual property officer, was privy to the settlement discussions and testified that the $75,000 demand was "inflammatory." The trial court found that the other settlement terms were not related to the trade secret action and were made for an anticompetitive purpose. The condition that respondents not work with certain third party foundries was an unlawful trade restraint. (Bus. & Prof. Code, § 16600.) The condition that respondents not hire appellants' employees violated public policy (*ibid.*) as did the demand that Parrish not communicate relevant information to the federal government about the patent applications (see 37 C.F.R. § 1.56 (2008); *Honeywell Intern., Inc. v. Universal Avionics Systems* (Fed.Cir. 2007) 488 F.3d 982, 999 [applicants for patents have duty to prosecute patent applications with candor, good faith, and honesty]).

■ A trial court, in awarding sanctions, may consider a party's dilatory tactics and bad faith settlement demands in maintaining the action. (§ 3426.4; *Gemini, supra*, 95 Cal.App.4th at p. 1263; see, e.g., *In re Marriage of Norton* (1988) 206 Cal.App.3d 53, 58–60 [253 Cal.Rptr. 354].) Here the settlement terms were inflammatory, violated public policy, and were made in bad faith.

### Pretrial Motions

Appellants argue that the trial court was estopped from finding bad faith because the court denied a motion for summary judgment, a motion in limine, and two nonsuit motions. In certain tort actions, such as malicious prosecution, the denial of summary judgment normally precludes the trial court from finding that the lawsuit was frivolous. (See *Zamos v. Stroud* (2004) 32 Cal.4th 958, 973, fn. 10 [12 Cal.Rptr.3d 54, 87 P.3d 802].) "We say 'normally' rather than 'conclusively' because there may be situations where denial of summary judgment should not irrefutably establish probable cause. For example, if denial of summary judgment was induced by materially false facts submitted in opposition, equating denial with probable cause might be wrong. Summary judgment might have been granted but for the false evidence." (*Roberts v. Sentry Life Insurance* (1999) 76 Cal.App.4th 375, 384 [90 Cal.Rptr.2d 408].)

Appellants opposed the summary judgment motion with expert declarations suggesting there was a scientific methodology to predict the likelihood of trade secret misuse. The trial court found that respondents made a compelling argument for summary judgment but "the concepts involved in this action are highly technical." Erring on the side of caution, the trial court denied the summary judgment motion to see what would develop.

At trial, appellants' experts admitted there was no valid scientific methodology to predict trade secret misuse and agreed that no trade secrets were misappropriated. Both experts failed to address the possibility that respondents might lawfully acquire Raytheon's internal technology for the startup

business. One expert, Daniel Murphy, assumed that respondents would not innovate at the new company and incorrectly assumed that respondents planned to manufacture and sell bolometers in one year.

The trial court, in awarding sanctions, ruled: "The denial of the motion [for summary judgment] was not a ruling on whether [appellants] initiated or maintained the lawsuit in bad faith." The court denied the motion because it had not heard all the evidence or considered witness credibility.

Appellants cite no California authority that the denial of a summary judgment motion in a trade secret case precludes the trial court from finding, after it has heard all the evidence, that the action was brought or maintained in bad faith. (See *Waller v. TJD, Inc.* (1993) 12 Cal.App.4th 830, 836 [16 Cal.Rptr.2d 38] [order denying summary judgment is not a basis to reverse a judgment entered after trial on the merits]; Weil & Brown, Cal. Practice Guide, Civil Procedure Before Trial (The Rutter Group 2009) ¶ 10:364, p. 10-129 (rev. # 1, 2007).) If the rule were otherwise, a trade secrets plaintiff could file sham declarations to successfully oppose a summary judgment motion and immunize itself from sanctions.

██ Under the Uniform Trade Secrets Act, sanctions may be awarded for the bad faith filing *or* maintenance of a groundless action. (*Gemini, supra*, 95 Cal.App.4th at pp. 1261–1262.) A trade secrets claim could be brought in good faith but warrant attorney fees were the claim pursued beyond a point where the plaintiff no longer believes the case has merit. (See *Yield Dynamics, Inc. v. TEA Systems Corp.* (2007) 154 Cal.App.4th 547, 579, fn. 20 [66 Cal.Rptr.3d 1] [discussed but not decided].) " 'Bad faith may be inferred where the specific shortcomings of the case are identified by opposing counsel, and the decision is made to go forward despite the inability to respond to the arguments raised.' [Citation.]" (*Gemini, supra*, 95 Cal.App.4th at p. 1264.) The trial court reasonably inferred that appellants knew there was no misappropriation or threatened misappropriation of trade secrets before the summary judgment motion was argued.

In *Gemini*, the Court of Appeal rejected the argument that lack of bad faith was established by the denial of a nonsuit motion. (*Gemini, supra*, 95 Cal.App.4th at p. 1264, fn. 6.) The same principle applies here. At trial, appellants' experts conceded there was no accepted scientific methodology for predicting the misuse of trade secrets and made false assumptions that respondents would not innovate new technology or acquire technology from a third party. The trial court found that appellants used expert testimony to "unreasonably discount[] ways in which Defendants could have proceeded with the new company lawfully." The award for sanctions was proper. It is well settled that "[n]o one can take advantage of his own wrong." (§ 3517.)

■ Appellants assert that the tentative statement of decision includes a finding that respondents did not prevail on an unclean hands defense, thus precluding the trial court from finding the action was brought in bad faith. The argument fails for several reasons. First, a tentative statement of decision is not binding on the trial court and can be modified or changed as the judge sees fit before entry of judgment. (Cal. Rules of Court, rule 3.1590(b); *Horning v. Shilberg* (2005) 130 Cal.App.4th 197, 203 [29 Cal.Rptr.3d 717].) A tentative decision cannot be relied on to impeach the judgment on appeal. (*In re Marriage of Ditto* (1988) 206 Cal.App.3d 643, 646–647 [253 Cal.Rptr. 770].) ■ Second, the doctrine of unclean hands relates to misconduct occurring before the lawsuit was filed, not the bad faith filing or maintenance of an action. (See, e.g., *Smoketree-Lake Murray, Ltd. v. Mills Concrete Construction Co.* (1991) 234 Cal.App.3d 1724, 1743–1744 [286 Cal.Rptr. 435].) Moreover, the doctrine of unclean hands does not apply to an action for unfair competition, alleged here as an alternative theory for injunctive relief. (See *Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 179–180 [96 Cal.Rptr.2d 518, 999 P.2d 706].) "Courts have long held that the equitable defense of unclean hands is not a defense to an unfair trade or business practices claim based on violation of a statute." (*Ticconi v. Blue Shield of California Life & Health Ins. Co.* (2008) 160 Cal.App.4th 528, 543 [72 Cal.Rptr.3d 888].)

### *Posttrial Bad Faith Hearing*

Appellants contend that the trial court erred in not conducting a posttrial hearing to address the issue of bad faith. In *Yield Dynamics, Inc. v. TEA Systems Corp., supra,* 154 Cal.App.4th 547, the trial court excluded evidence, proffered after trial, that the trade secrets action was filed in good faith. The Court of Appeal held that it was error because "[t]he subjective element of bad faith . . . might be proven or refuted by evidence that would have been wholly irrelevant at trial." (*Id.* at p. 579.)

Unlike *Yield Dynamics, Inc. v. TEA Systems Corp.*, here the trial court did not exclude evidence before ruling on the question of bad faith. Appellants' request for a posttrial hearing was denied because the court had received voluminous briefing and had already found objective and subjective bad faith. Appellants did not object to the briefing schedule or make an offer of proof that they had new evidence.

The assertion that appellants were denied a meaningful opportunity to address sanctions is equally without merit. Sanctions were discussed a few days after the action was filed, in the answer to the complaint, in opening

statement, in closing statement, and in the posttrial briefs. On the next-to-last day of trial, the trial court asked counsel to brief sanctions and the inevitable disclosure doctrine which was "the heart of the case." Appellants' posttrial brief devoted 10 pages to sanctions and stated: "Throughout trial, Defendants consistently claimed that they would prove that Plaintiffs brought this action in bad faith."

A fair reading of the 25-page judgment and statement of decision with citations to the pleadings, to discovery, to the settlement discussions, to the pretrial motions, and to the trial evidence obviated any need for a further hearing. The complaint states that appellants were entitled to a permanent injunction and punitive damages yet FLIR's CEO, Earl Lewis, had no evidence that respondents had engaged in wrongdoing.

Lewis's testimony is remarkable and clearly shows that the action was brought for an anticompetitive purpose. Lewis did not "think it would be good, healthy for them [respondents] to go and directly compete with us." Lewis stated that FLIR "couldn't tolerate a direct competitive threat by [respondents] because it would fly in the face of everything that we spent 200 million dollars to buy." Lewis's statements were corroborated by FLIR Senior Vice-President Tony Trunzo who testified that respondents' "vision for the industry will take place someday" but FLIR "wanted that competition to take place as far out in the future as possible."

The trial court reasonably concluded that further briefing or posttrial testimony on the question of bad faith would be repetitive and unnecessary. It had already found objective speciousness and subjective bad faith and calendared the matter to determine reasonable attorney fees.[5] Appellants did not file a motion for new trial and had no due process right to retry the issue of bad faith.

---

[5] Respondents moved for $2,399,650.55 attorney fees and were awarded $1,352,000 fees plus $289,216.78 costs. The order granting fees and costs recites the following bad faith findings which were previously made in the statement of decision: "Plaintiffs initiated and continued to pursue this action against Defendants in bad faith and primarily for the anticompetitive motive of preventing Defendants from attempting to create a new business in competition with Plaintiffs. . . . Plaintiffs engaged in subjective and objective bad faith. . . . Plaintiffs' suspicions regarding Defendants were not sufficient to justify the filing of the lawsuit on June 15, 2006, or the maintenance of the lawsuit through trial in December 2007. . . . Plaintiffs initiated and maintained the lawsuit in bad faith in that Plaintiffs proceeded on a legal theory that Defendants would misuse trade secret[s] in the future, and that 'inevitable disclosure' type of theory is not supported by California law. . . . The Court finds that plaintiffs' theory for initiating the lawsuit, as described in Mr. Lewis's testimony is not consistent with California law . . . [and] Plaintiffs continued the lawsuit in bad faith [after] Defendants notified Plaintiffs of problems in Plaintiffs' case. . . ."

*Conclusion*

Appellants' remaining arguments merit no further discussion.

The judgment and order awarding respondents $1,641,216.78 in attorney fees and costs are affirmed. (§ 3426.4.) Respondents are awarded costs and attorney fees on appeal, in an amount to be determined by the trial court on noticed motion. (*Gemini, supra,* 95 Cal.App.4th at pp. 1264–1265.)

Coffee, J., and Perren, J., concurred.

Appellants' petition for review by the Supreme Court was denied September 23, 2009, S174910. Werdegar, J., did not participate therein.