Filed 3/19/24  Reilly Financial Advisors v. Cariani CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| REILLY FINANCIAL ADVISORS, LLC,<br><br>　　　Plaintiff, Cross-Defendant and Appellant,<br><br>　　　v.<br><br>DAVID CARIANI et al.,<br><br>　　　Defendants, Cross-Complainants, and Respondents. | D081870<br><br><br>(Super. Ct. No. 37-2019-00059651-CU-BT-CTL) |

APPEAL from a judgment of the Superior Court of San Diego County, Katherine A. Bacal, Judge.  Affirmed.

Duckor Metzger & Wynne, Scott L. Metzger and Nathaniel R. Smith for Plaintiff, Cross-Defendant and Appellant.

Witham Mahoney & Abbott, Matthew M. Mahoney, Mary K. Wyman and Michael Leone for Defendants, Cross-Complainants and Respondents.

## I.   INTRODUCTION

Reilly Financial Advisors, LLP (RFA) sued two former employees, David Cariani and Matthew Griffith, and their new employer, Centura Wealth Advisory, (collectively, Respondents) for trade secret

misappropriation, among other claims. After nearly two years of discovery, Respondents filed a motion for summary judgment. RFA sought an extension on its response but, rather than responding to the motion, RFA moved to dismiss its claims. Respondents sought, and the trial court awarded, attorney fees pursuant to Civil Code section 3426.4 of the Uniform Trade Secrets Act (UTSA), which gives the trial court discretion to award such fees if a claim of misappropriation is made in bad faith.[1] RFA appeals from the judgment awarding fees and asserts that the trial court erred in determining that Respondents had met the two-prong test for establishing that RFA brought its misappropriation claim in bad faith. We disagree and affirm the judgment.

## II.   FACTUAL AND PROCEDURAL BACKGROUND

A.   *Allegations in the Complaint*

RFA is a financial planning and investment firm. Cariani began working for RFA in April 2013, initially as a senior wealth advisor and later as chief investment officer. Griffith began working for RFA in December 2011, as a senior wealth advisor and then as director of wealth management. Griffith and Cariani resigned from their employment at RFA on February 1, 2019, and went to work in similar roles for Centura Wealth Advisory (Centura), a direct competitor to RFA.[2]

While employed at RFA, Respondents each had a number of existing and prospective clients that they serviced. RFA engaged in various forms of marketing and business development to secure these clients, and they were

---

[1]   All further statutory references are to the Civil Code.

[2]   RFA filed its complaint against Respondents on November 8, 2019, approximately nine months after Cariani and Griffith resigned from RFA.

2

clients of RFA, not the individual Respondents. Respondents spent none of their own money on RFA's marketing efforts. RFA also maintained a comprehensive client relationship management system (CRM) with information regarding its clients, their investments, and such details as their personal risk tolerance.

"RFA has invested significant time and money marketing to, vetting and establishing relationships with clients, creating and implementing its processes for managing client relationships, and developing [the CRM data]." Accordingly, RFA maintains the data on a secure, encrypted computer network and requires its employees to sign confidentiality agreements. Like other RFA employees, Cariani and Griffith each signed a "Confidentiality and Restrictive Covenant Agreement" in December 2016. The agreement required them to return all confidential information to RFA upon termination of their employment with RFA.

RFA alleged that Respondents breached these obligations when they left RFA to join Centura. More specifically, RFA alleged, on information and belief, that Respondents "took with them and gave to Defendant Centura [c]onfidential [i]nformation that they had stolen from RFA, and that Defendants Cariani, Griffith, and Centura have used information stolen from RFA to unlawfully compete against [RFA], including by soliciting RFA's clients to leave RFA and retain Centura." RFA alleged further that Respondents "have made repeated efforts to interfere with RFA's contractual relationships with its clients and to solicit RFA's clients and, in some instances, have been successful in . . . inducing these clients to move their accounts from RFA to Defendant Centura," and that, "[d]espite demand being made upon them to immediately cease and desist from their illegal conduct and return to RFA the information they stole, [they] refused to do so and

3

have continued to use the information they stole from RFA to unlawfully compete against [RFA]."

Based on the foregoing allegations, RFA asserted causes of action for breach of contract, misappropriation of trade secrets, and statutory and common law unfair business practices.

B. *Response to the Complaint, Motion for Summary Judgment and Dismissal*

Respondents filed a general denial to the complaint, and asserted 10 affirmative defenses, including failure to state a cause of action, illegality, and unclean hands. They also filed a cross-complaint in which they alleged that RFA made false and defamatory accusations of theft and unethical behavior against them in an effort to retain clients that wanted to move their accounts to Centura.

After two years of discovery, during which Respondents produced over 10,000 documents, Respondents filed a motion for summary judgment or, in the alternative, summary adjudication, with a hearing date of November 5, 2021. In support of the motion, Respondents provided declarations from Cariani and Griffith; excerpts from the depositions of Frank Reilly and certain other RFA employees; and a number of exhibits, including copies of notices Cariani and Griffith sent to certain RFA clients upon their resignations, and copies of e-mails and text messages to and from their former RFA clients in the days that followed.

Respondents alleged, in the motion and associated declarations, that Cariani and Griffith left RFA because they disagreed with new policies that RFA intended to implement. They conceded that Cariani and Griffith sent a one-page notice—commonly known as a "tombstone"—to family, friends, and certain RFA clients announcing that they were joining Centura. And they conceded that they accessed client information in the CRM system on their

4

last day of employment at RFA to obtain client addresses for the tombstone announcements, but averred that they did not save or in any way take the information with them when they left and did not transmit or disclose it to Centura. Rather, Cariani and Griffith declared that they "went to great lengths to ensure that they took no confidential information upon resigning from RFA," including deleting all electronic information related to RFA or any RFA client from their personal devices.

Respondents stated that Cariani contacted approximately 15 former RFA clients, whose information he found on public databases, after learning that Frank Reilly was making disparaging comments about him. Likewise, Griffith called approximately 18 former RFA clients, whom he had neglected to send the tombstone notice to, but only told them his new contact information. He did not speak to them substantively unless they called back and expressed an interest in moving their accounts to Centura. Respondents admitted that 22 RFA clients (out of hundreds) eventually transferred over to Centura, but asserted that 16 of the 22 were either Cariani and Griffith's friends and family, or persons who were referred directly to Cariani and Griffith by other RFA clients.

Finally, Respondents acknowledged RFA's claim that Cariani had e-mailed himself a copy of a "defensive portfolio" maintained by RFA, which contained sensitive information about client accounts, two days before leaving RFA. Cariani averred that he regularly sent himself copies of the portfolio when working outside the office, but that he deleted anything related to the portfolio or the "Bloomberg Terminal," from which it came, upon his departure from RFA. He did not share the information with Centura or anyone else. In addition, he explained that retaining the portfolio

would not have provided him an advantage in any event as he could get the same information from client account statements.

RFA obtained a continuance on Respondent's motion for summary judgment, allegedly to pursue additional discovery, and scheduled depositions for Griffith and Cariani in March 2022. RFA then filed requests to dismiss the complaint and cross-complaint without prejudice in late February, just before the depositions. The trial court granted the requests in March 2022.

C.  *Attorney Fees Motion*

Respondents filed a motion for attorney fees pursuant to section 3426.4. They asserted that RFA brought the action in bad faith knowing that they lacked evidence to support their "speculative theory" that Respondents "must have stolen their clients because only a handful of clients (out of hundreds) elected to transfer over to Centura." Respondents asserted, further, that RFA persisted despite a lengthy and contentious discovery period that produced no further evidence of wrongdoing. They also pointed out that RFA had filed two other, nearly identical lawsuits against two other advisors that resigned from RFA in the previous two years. Respondents argued, based on the foregoing, that RFA's true motivation was to send a message to its advisors that anyone who left the company to work for a competitor would be sued.

In its opposition, RFA pointed to the following categories of evidence as support for its claim: (1) Griffith and Cariani accessed its CRM before leaving and sent the tombstone notice to approximately 130 RFA clients; (2) Cariani wiped his browser history before resigning, leading "RFA to the reasonable conclusion that Cariani was attempting to hide wrongdoing"; (3) Cariani sent himself a copy of RFA's defensive portfolio two days before resigning; and (4) clients had informed RFA that Respondents called and solicited them to move their business to Centura. RFA asserted further that

6

it maintained the lawsuit to vindicate its rights, and not for any bad faith purpose. RFA disputed Respondents' reliance on the two other pending lawsuits, and pointed out that those cases had not yet been resolved on their merits.

After reviewing the evidence and hearing argument from the parties, the trial court concluded that Respondents had shown that RFA brought and maintained the action in bad faith. The court therefore granted the motion in part and found that the alleged evidence in support of RFA's claims supported only a *suspicion* of misappropriation; that "[s]uspicion is not the same as evidence"; and that RFA should have conducted a more thorough investigation before filing the complaint. The trial court also found that Respondents had shown subjective bad faith, which could be inferred from circumstantial evidence. The court clarified that Respondents did not rely on the other lawsuits as the sole evidence of bad faith, but that they did bolster Respondents' arguments. The court reduced the amount of the fees significantly to account for time spent prosecuting the cross-complaint, and ultimately awarded Respondents fees in the amount of $272,325.05.

RFA timely appealed from the resulting judgment, and in particular that portion of the judgment awarding attorney fees.

### III. DISCUSSION

RFA contends the trial court erred in granting Respondents' request for attorney fees for several reasons: by failing to consider circumstantial evidence as evidence supporting its claims; by holding that RFA was required to conduct a thorough investigation before filing suit; by relying on the other two lawsuits as evidence of bad faith; by inferring subjective bad faith based on a lack of evidence; and by awarding attorney fees from the inception of the case.

7

A.      *Governing Law and Standard of Review*

Civil Code section 3426.4 provides, in relevant part:  "If a claim of misappropriation is made in bad faith . . . the court may award reasonable attorney's fees and costs to the prevailing party."

" 'Although the Legislature has not defined "bad faith" ' for purposes of section 3426.4, 'our courts have developed a two-prong standard: (1) objective speciousness of the claim, and (2) subjective bad faith in bringing or maintaining the action, i.e., for an improper purpose.' " (*Cypress Semiconductor Corp. v. Maxim Integrated Products, Inc.* (2015) 236 Cal.App.4th 243, 260 (*Cypress*).)  "Objective speciousness is said to be present 'where the action superficially appears to have merit but there is a complete lack of evidence to support the claim.' " (*Id.* at p. 261.)  It is not necessary for the party seeking attorney fees to prove that the action superficially appeared to have merit; they must only prove that there is an objective lack of evidence to support any claims asserted under the UTSA.  (*Cypress,* at p. 261.)

"Subjective bad faith under section 3426.4 means the action was commenced or continued for an improper purpose, such as harassment, delay, or to thwart competition."  (*SASCO v. Rosendin Electric, Inc.* (2012) 207 Cal.App.4th 837, 847 (*SASCO*).)  "The timing of the action may raise an inference of [subjective] bad faith."  (*FLIR Systems, Inc. v. Parrish* (2009) 174 Cal.App.4th 1270, 1278 (*FLIR*).)  " ' "Bad faith may be inferred where the specific shortcomings of the case are identified by opposing counsel, and the decision is made to go forward despite the inability to respond to the arguments raised." ' " (*Id.* at p. 1283.)  "The trial court [may, in some circumstances] reasonably infer[] that appellants knew there was no misappropriation or threatened misappropriation of trade secrets before the summary judgment motion was argued."  (*Ibid.*)

"Because the award is a sanction, a trial court has broad discretion in awarding fees" under section 3426.4. (*FLIR, supra,* 174 Cal.App.4th at p. 1275.) A trial court awarding fees under section 3426.4 does not need to state the basis for its decision on the record. (*Cypress, supra,* 236 Cal.App.4th at p. 266.) " '[T]he necessary findings of ultimate facts will be implied and the only issue on appeal is whether the implied findings are supported by substantial evidence.' " (*Ibid.*; see also *FLIR,* at p.1278 [" ' "In reviewing the facts which led the trial court to impose sanctions, we must accept the version thereof which supports the trial court's determination, and must indulge in the inferences which favor its findings." ' "].) However, whether the trial court applied the correct legal standard in exercising its discretion to award attorney fees under section 3426.4 is a question of law that we review de novo.[3] (*Cueto v. Dozier* (2015) 241 Cal.App.4th 550, 560.)

B.     *Objective Speciousness/Lack of Evidence*

In support of its finding that Respondents had met their burden to establish objective speciousness—or a lack of evidence to support the asserted claims—the trial court explained: "At oral argument, [RFA's] counsel pointed to four different pieces of alleged evidence in support of [RFA's] claims. But, as [Respondent] replied, all this evidence only supported [RFA's] *suspicion* of misappropriation. Suspicion is not the same as evidence. As the *SASCO* court made clear, given [RFA's] suspicion, [RFA] should have conducted a 'thorough investigation prior to filing suit. . . .' *SASCO v. Rosendin Elec., Inc.* [2012] 207 Cal.App.4th at [p.] 844. This they did not do."

_____

[3]     While we acknowledge that the correct legal standard is a matter of law that we review de novo, we disagree with Appellant's assertions that the trial court's findings, including as to objective speciousness of the claims, are subject to a de novo standard of review.

1. RFA's Evidence

RFA asserts that, contrary to the trial court's ruling, the categories of evidence it relied upon were sufficient to support its claim. In doing so, RFA asks us to reweigh the evidence and overlook the requirements underlying a claim for misappropriation.

First, RFA asserts that Griffith and Cariani admitted that they acquired addresses from the CRM database. But, as RFA concedes, Griffith and Cariani did so solely for the purpose of sending the tombstone notice announcing their change of employment, which was legally permissible. (See *Reeves v. Hanlon* (2004) 33 Cal.4th 1140, 1156 (*Reeves*).)

RFA argues *Reeves* is not applicable here because RFA's claim of misappropriation is based on the mere acquisition of names from the confidential CRM, as opposed to that from Griffith and Cariani's memory. To the contrary, like here, the defendants in *Reeves* accessed a "password-protected computer database to print out confidential name, address, and phone number information on 2,200 clients." (*Reeves, supra,* 33 Cal.4th at p. 1146.) With that fact in mind, the California Supreme Court found that "the UTSA does not forbid an individual from announcing a change of employment, *even to clients on a protected trade secret client list*." (*Reeves*, at p. 1156, italics added.)

Misappropriation requires acquisition of a trade secret by improper means or "[d]isclosure or use" of a trade secret.[4] (§ 3426.1, subd. (b).) Mere possession of a trade secret by a departing employee is not sufficient to

---

[4] " 'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." (§ 3426.1, subd. (a).)

support an action under the UTSA. (*FLIR, supra,* 174 Cal.App.4th at p. 1279.) RFA has presented no authority, here or in the trial court, suggesting that the mere accessing of client names and addresses, for the purpose of sending an announcement like the one at issue is *Reeves*, is sufficient to support a claim for misappropriation.

Second, in a related argument raised for the first time in its reply brief, RFA asserts that Cariani's wiped browser history raised an inference of wrongdoing, which was later proven when Respondents admitted to accessing the CRM database to obtain client addresses. Like the foregoing argument, though, this evidence does not support a claim of misappropriation. Rather, as the trial court found, at most it supported a suspicion that RFA could, and should, have investigated further.

Third, RFA asserts there was evidence Griffith and Cariani solicited RFA clients over the phone. In *American Credit Indemnity Co. v. Sacks* (1989) 213 Cal.App.3d 622 (*American Credit*), one of the cases the California Supreme Court relied on in *Reeves*, the court explained: "[m]erely informing customers of one's former employer of a change of employment, without more, is not solicitation. Neither does the willingness to discuss business upon invitation of another party constitute solicitation on the part of the invitee. Equity will not enjoin a former employee from receiving business from the customers of his former employer, even though the circumstances be such that he should be prohibited from soliciting such business." (*American Credit,* at p. 636; *Reeves, supra,* 33 Cal.4th at p. 1156 [citing *American Credit* with approval].)

Here, RFA relies on self-serving testimony from Frank Reilly and an e-mail from an RFA employee stating that an RFA client stated that Griffith "had asked them to come and join him at the new firm." Neither is evidence

11

of misappropriation or unlawful solicitation.  Notably, the e-mail states that the client *declined*, and that the RFA employee let the client "know that there was pending litigation against [Griffith]," supporting Respondents' explanation that they were calling former clients in response to disparaging comments made by RFA.  In his deposition, Reilly asserted that clients told "us" (presumably, RFA) that Griffith offered them investment advisory services but he conceded that he could not recall which clients made such statements, that he did not know exactly what was said, and that he did not talk to any clients directly.

RFA also relies on notes that Griffith and/or Cariani took during their calls but, if anything, those notes belie RFA's claims as many of the entries indicate that substantive conversations occurred only after the client called Griffith or Cariani.  Likewise, the record also contains notes from various RFA employees calling existing clients in February and March 2019 to discuss the resignations.  Those notes confirm that the vast majority of clients were either unaware of the move, or aware only because they received the tombstone notice, and made no reference to either Griffith or Cariani attempting to solicit their business.  This evidence supports the trial court's finding that RFA's claim of improper solicitation of former RFA clients was speculative and unsupported by the evidence.

Fourth and finally, RFA relies on screenshots and related testimony showing that Cariani sent himself a copy of the defensive portfolio two days before his resignation.  The screenshots, taken from a third party database interface, indicate that two different reports were sent from "David Cariani (REILLY FINANCIAL ADV)" to "David Cariani (REILLY FINANCIAL ADV)."  Dean Peabody, an RFA employee, testified at deposition about the screenshots.  He said that he did not recall whether he was able to open the

12

attachments. He explained that the "from" was from Cariani's Bloomberg account, and he knew that because "Bloomberg is a closed-in system" so someone accessing it could only send an e-mail from their Bloomberg account. He agreed that the "to" line was the same as the "from" line but stated that he did not investigate what e-mail address was related to the "to" line because he did not know how. Thus, he did not know whether Cariani sent the report outside of RFA. He also did not recall whether he checked to see if Cariani had sent similar reports to the same address in the past. Another employee, Sonja Larimore, testified that she searched the RFA e-mail archives for an e-mail to Cariani containing the reports and did not find any such e-mail. She confirmed that she was not aware of any further investigation into the matter by RFA.

As with the other forms of evidence, the mere sending of the portfolio to an unknown address *while Cariani was still employed by RFA* is not evidence of wrongdoing or misappropriation. (See *FLIR, supra,* 174 Cal.App.4th at p. 1279.) Cariani was required, per his agreement with RFA, to purge all information related to RFA upon his departure. He averred that he did so, and, despite alleging in the complaint that they made demands on Respondents to return the allegedly stolen confidential information, RFA presented no evidence of such demands or Respondents' failure to comply. There is also nothing in the record to suggest that RFA made any attempt to investigate the screenshot further—for example, by contacting the owner of the database to inquire whether they could determine where the report was sent.

Based on the foregoing, we conclude that substantial evidence supports the trial court's finding that Respondents had met their burden to establish objective speciousness.

## 2. The Court's Statement Regarding Circumstantial Evidence

RFA asserts that the trial court erred because it stated on the record, during argument, that the evidence it presented was at least circumstantial evidence of misappropriation, and therefore the court must have incorrectly concluded that the "circumstantial evidence did not constitute evidence for the purposes of the objective prong."

During the hearing on the fee motion, RFA's counsel addressed Respondents' argument that its claims were based on speculation rather than evidence and stated: "Cariani's wiping of his browser history giving rise to reasonable inference that he had something to hide. [Respondents] argue in reply that this is mere speculation, not evidence or they should have conducted a thorough forensic examination of Cariani's computer." The trial court responded: "Well, I think it's circumstantial evidence." RFA's counsel then stated, "Exactly," and asserted circumstantial evidence was sufficient to raise an inference and sustain a verdict. The court then turned its attention to the subjective bad faith prong.

Nothing in this exchange suggests that the trial court found, or believed, that RFA had presented sufficient circumstantial evidence *to support its claims*. It is quite possible that the court simply meant that there was some circumstantial evidence that Cariani "had something to hide." But such an inference, without more, was not sufficient to support a claim *for misappropriation*. Rather, as we have explained, the trial court's ultimate finding in its written order that Respondents met their burden to show an absence of evidence is supported by substantial evidence.

## 3. The Court's Statement Regarding a Thorough Investigation

RFA next asserts that the trial court erred by concluding, in reliance on *SASCO*, that RFA "should have conducted a 'thorough investigation prior to filing suit.' "

14

In *SASCO*, the appellate court noted that the trial court "faulted SASCO for not conducting a thorough investigation prior to filing suit (e.g., by asking knowledgeable individuals why SASCO did not obtain the contract or by conducting forensic tests to determine whether defendants took computer files)." (*SASCO, supra,* 207 Cal.App.4th at p. 844.) The appellate court found that the trial court applied the correct rule of law in making its ruling. (*Id*. at p. 845.) SASCO argued that it should have been held only to the pleading standard set forth in section 128.7, but the court squarely rejected that argument. (*SASCO,* at pp. 845−846 ["There is no reason to import the statutory language of [ ] section 128.7 into the meaning of 'bad faith' as used in section 3426.4."].) The court went on to point out: " '[I]n enacting section 3426.4 the Legislature was concerned with curbing 'specious' actions for misappropriation of trade secrets, and such actions may superficially appear to have merit." (*SASCO,* at p. 846.)

The trial court's statement supporting its finding of subjective bad faith was similar in this case. RFA may have had some circumstantial evidence that gave a superficial appearance of merit, but the record reveals that RFA failed to conduct any further investigation to determine whether the evidence it was relying upon amounted to anything more than mere suspicion of wrongdoing before filing suit. RFA now asserts that, by quoting this language from SASCO, the trial court in this case imported some additional burden on RFA. Not so. Although RFA was not necessarily *required* to conduct further investigation under the pleading standard, the trial court could nevertheless consider its failure to investigate the evidence it was relying on in readily available ways, such as calling the database administrator or getting statements from clients regarding the alleged solicitation, as evidence of subjective bad faith. In other words, RFA's

15

willingness to move forward with whatever scintilla of evidence it had, without any further investigation and despite a nine month delay, supports an inference that the suit was filed in bad faith.

As we have concluded, the trial court's finding that Respondents established an absence of evidence supporting RFA's asserted claims is supported by substantial evidence.

C.    *Subjective Bad Faith*

Regarding the second prong of subjective bad faith, the trial court stated:  "for purposes of section 3426.4, this means 'the action was commenced or continued for an improper purpose, such as harassment, delay, or to thwart competition.'  *SASCO, supra,* [207 Cal.App.4th] at [p.] 847.  This may be inferred from circumstantial evidence.  Defendants also have shown this as well.  Wyman Decl. ¶¶ 14−15; Exs. X, Y.  [¶]  At oral argument, plaintiff's counsel emphasized that the filing of other cases—which are still pending and have not been adjudicated—is insufficient to demonstrate subjective bad faith.  However, as defendant made clear in rebuttal, it did not rely solely on the filing of the other lawsuits, the other lawsuits merely bolstered [Respondents'] argument."

RFA asserts that the trial court erred both by inferring subjective bad faith "from a lack of evidence alone," and therefore "collapsing the established, two−prong test into a single prong," and by improperly relying on the two similar lawsuits filed against other financial advisors that had resigned from RFA as evidence of RFA's bad faith.  Neither argument has merit.

" ' "Bad faith may be inferred where the specific shortcomings of the case are identified by opposing counsel, and the decision is made to go forward despite the inability to respond to the arguments raised." ' "  (*FLIR, supra,* 174 Cal.App.4th 1270, 1283.)  Here, the trial court found there was no

evidence of misappropriation, prior to the commencement of the suit or following discovery. But the trial court did not rely solely on its prior finding that there was no evidence to support RFA's claims in making its determination of bad faith. Rather, it stated that bad faith could be "inferred from circumstantial evidence," *and* that the other lawsuits *bolstered* Respondents' arguments.

Respondents' other arguments included that RFA failed to take even readily available steps to confirm (or absolve) their suspicions of misappropriation; that RFA waited approximately nine months after Griffith and Cariani's departure to file the lawsuit; that RFA maintained the action for two years without obtaining any further evidence of misappropriation; and that RFA had filed two other lawsuits with *nearly identical allegations* against financial advisors that resigned and went to work for a competitor. All of these factors support a finding of subjective bad faith.

RFA asserts that the trial court could not infer anything from the other two pending cases because those two cases had not been resolved on their merits. But here, Respondents did not assert that it was the mere filing of additional cases against additional defendants that supported a finding of bad faith. It asserted that the *similarity* between the complaints in the three pending cases was evidence that RFA was using litigation as a tactic to send a message to other financial advisors that wanted to resign from RFA to work for a competitor. Indeed, a review of the three complaints reveals that much of the language is identical across all three, raising at least an inference that RFA routinely filed boilerplate complaints against departing employees. RFA presents no authority suggesting that the trial court could not consider the similarity between the three complaints simply because none had been

17

resolved, nor does it make any attempt to explain why the allegations are so similar.

Finally, RFA asserts that it could not have brought the claims in bad faith if it had reasonable suspicion of wrongdoing at the time of filing. Several courts have declined to hold that "a subjective belief in the merits of a claim will bar a fee award under section 3426.4 if the claim was maintained for an improper purpose." (*Cypress, supra,* 236 Cal.App.4th at p. 267 [discussing other cases].)  Regardless, here, as the trial court found, RFA had no more than an unconfirmed suspicion of wrongdoing; it has presented no evidence that it had a reasonable belief in the merits of its claims.

D.     *Reduction in Amount of Fees Awarded*

RFA asserts that the trial court erred by awarding all fees incurred defending against its claims, and that the trial court should have instead limited the fees to those incurred after RFA knew or should have known that its claims were not supported.  The argument fails for many of the same reasons we have explained with respect to the two-prong test for fees in the first instance.

The trial court found that Respondents "have shown [RFA] *brought and maintained* this misappropriation of trade secrets claim in bad faith."  (Italics added.)  Contrary to RFA's assertions, the trial court did not make any finding indicating that RFA was justified in bringing its claims in the first instance, but either knew or should have known, at some point *during* the litigation, that the claims were not actually supported by the evidence.  As we have already discussed, the trial court did state that the evidence "only supported [RFA's] *suspicion* of misappropriation," but correctly concluded that RFA's *suspicion*, without any further investigation, was not an adequate basis to support its claims.  It is apparent from the trial court's written ruling that it concluded both prongs of the applicable test were met when RFA first

18

filed its complaint.  Thus, there was no reason to reduce the fees based on such a turning point.

## IV.    DISPOSITION

The judgment is affirmed.  Respondents are awarded their costs on appeal.

KELETY, J.

WE CONCUR:


HUFFMAN, Acting P. J.


CASTILLO, J.