Filed 5/13/14  Aerotek. v. The Johnson Group Staffing CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| AEROTEK, INC.,<br><br>    Plaintiff and Appellant,<br><br>    v.<br><br>THE JOHNSON GROUP STAFFING COMPANY, INC., et al.,<br><br>    Defendants and Respondents;<br><br>PORTER SCOTT,<br><br>    Real Party in Interest and Respondent. | C070832<br><br>(Super. Ct. No. 34200700540602CUBTGDS) |

This court affirmed a judgment in favor of defendants, The Johnson Group Staffing Company, Inc. (the Johnson Group) and Michael Ponce, in *Aerotek, Inc. v. The Johnson Group Staffing Company, Inc., et al.* (July 30, 2013, C067652) [nonpub. opn.] (*Aerotek I*).  We concluded the defendants did not violate the Uniform Trade Secrets Act (UTSA) (Civ. Code, § 3426 et seq.)[1] by improperly announcing Ponce's new

---

[1]     Undesignated statutory references are to the Civil Code.

1

employment with the Johnson Group to clients of Ponce's former employer, Aerotek Inc. (*Aerotek I*, *supra,* C067652.) While the appeal in *Aerotek I* was pending, the trial court awarded $735,781.27 in attorney fees to defendants under section 3426.4. Section 3426.4 provides attorney fees to the prevailing party in a UTSA action "[i]f a claim of misappropriation is made in bad faith." In an amended order awarding attorney fees, the trial court determined real party in interest, the law firm of Porter Scott, is entitled to a portion of the attorney fees for its representation of defendants.

On appeal, Aerotek challenges the attorney fees award on grounds that (1) this action was neither objectively specious nor brought in subjective bad faith as required for fees under section 3426.4, and (2) the lodestar multiplier used by the trial court was based on misrepresentations by Porter Scott. Aerotek asserts Porter Scott was continuing to represent the Johnson Group on a contingency arrangement under threat of a malpractice lawsuit and not for altruistic reasons.[2]

We conclude the trial court properly determined Aerotek's misappropriation of trade secrets case to have been objectively specious and brought in subjective bad faith. On the first prong of objectively specious, we conclude that without credible expert testimony, Aerotek was unable to prove lost profits or unjust enrichment. On the second prong of subjective bad faith, we conclude Aerotek had an anti-competitive motive for suing the Johnson Group. As to Aerotek's challenge to the lodestar multiplier, we reject the challenge based on the trial court's findings the case presented difficult questions of law, Porter Scott attorneys provided quality legal representation, the nature of the litigation precluded other work by the attorneys, and the risk incurred by Porter Scott attorneys in continuing to represent the Johnson Group on a contingency arrangement.

---

[2] Defendants the Johnson Group and Ponce join the arguments in support of the judgment made in the respondent's brief filed by Porter Scott.

2

Aerotek's assertion Porter Scott continued to represent the Johnson Group under threat of a malpractice lawsuit is unsupported by the record and, even if true, does not undermine the factors relied upon by the trial court to award a multiplier on the lodestar. We affirm the order awarding attorney fees under section 3426.4 and the amended order that entitled Porter Scott to share in a portion of the fees. We remand the matter for the trial court to award to defendants and real party in interest reasonable attorney fees and costs for this appeal.

## BACKGROUND

In recounting the factual and procedural history of this case, we draw on the statement of facts set forth in *Aerotek I*.

### *The First Trial*

In November 2007, Aerotek sued the Johnson Group and Ponce based on allegations in the complaint that Ponce unlawfully solicited 15 of Aerotek's customers.[3] Aerotek alleged Ponce's solicitations violated the nondisclosure agreement he had signed with Aerotek and constituted a misappropriation of Aerotek's trade secrets under the UTSA. Aerotek's complaint asserted its customer list constituted a trade secret under the UTSA. The defendants filed an answer denying any wrongdoing and asserting Aerotek's customer list did not qualify as a trade secret.

The matter proceeded to trial on Aerotek's narrowed claim defendants solicited only five customers. During the first trial, economist Michael Ward testified there was an "infinitesimally small" chance Ponce randomly solicited the companies on which Aerotek focused. In making the calculation, Ward assumed Ponce "did it randomly, that he did

---

[3] Despite the complaint's focus on only 15 customers, Aerotek's first settlement demand was a 24-month prohibition on defendants soliciting the business of 37 clients out of 65 Aerotek believed had been wrongfully solicited. Aerotek also believed it had suffered $1 million to $2 million in lost profits due to defendants' misappropriations.

not pay attention to any information that he had from his former clients." Ward had neither read Ponce's deposition nor analyzed the staffing industry before making his calculation.

The jury returned a special verdict in which it found defendants misappropriated Aerotek's customer information and the misappropriation caused Aerotek to sustain damages. However, the jury found the misappropriation was not a substantial factor in causing those damages. The jury also found Ponce breached his nondisclosure agreement with Aerotek and caused Aerotek to suffer $40,000 in damages.

Aerotek filed a motion for new trial based on inconsistent verdicts. The trial court granted the motion and ordered all of the issues to be retried.

### The Second Trial

Aerotek's trial brief for the second trial asserted Ponce had stolen a binder containing the customer list and used it to solicit "8 to 15 of his 'industry friends' all of which were individuals whom he had met and interacted with in his capacity as an Aerotek employee." At the beginning of trial, however, Aerotek informed the court that "any claim that the binder was actually stolen has been abandoned." Aerotek also announced it would limit its damages claim to the alleged misappropriation of only three customers.[4] During the second trial, Aerotek also sought injunctive relief –- but not damages –- as to a fourth customer.

During the second trial, the parties stipulated Aerotek's customer list was a trade secret under the UTSA. Aerotek adduced evidence as follows: Aerotek operates as a

---

[4] References to the names and identities of Aerotek's customers were sealed throughout the trial court proceedings. To preserve the confidential identities of the three customers on which Aerotek focused during the second trial, we refer to them as Customers A, B, and C or Companies A, B, and C. (§ 3426.5 [providing for preservation of trade secrets in judicial proceedings].)

staffing company that provides temporary and permanent employees to companies including those in the environmental and engineering fields. Sometimes, Aerotek employees needed years to persuade a customer to use a staffing company for an environmental or engineering placement. Aerotek considered its list of customers to be a valuable trade secret it sought to protect from its competitors.

Ponce became an Aerotek employee in March 2005. As a condition of employment, he signed a nondisclosure agreement that prohibited him from revealing the customers of Aerotek. In early 2006, Ponce became an account manager, working directly with representatives of Aerotek's customers in the environmental and engineering fields. By spring 2007, Ponce's supervisor observed he had become "very stressed" in his role as account manager. In June 2007, Ponce told his supervisor he was resigning from Aerotek "to go on vacation to Mexico" and then "pursue getting back into social work, which is where his previous experience and education was from." In response to his supervisor's questions, Ponce denied he planned to work for any of Aerotek's competitors.

Before Ponce left Aerotek, he worked to transition his customers to his replacement, Mike O'Brien. Ponce expressed reservations about O'Brien's lack of experience in the environmental and engineering fields. Nonetheless, Ponce set up as many in-person meetings between customers and O'Brien as he could. Ponce and O'Brien eventually met with six or seven Aerotek customers –- including Customers A and B –- to transition them to working with O'Brien. Ponce also worked to transition Customer C to working with Jeff LaChance, another Aerotek employee. At all transition meetings, Ponce told Aerotek's customers he did not know what he would be doing after he left Aerotek. He did not tell anyone he was going to stay in the staffing industry.

During the transition meeting with Customer A, its representative asked Ponce to "follow up with him no matter where [Ponce] landed." Ponce understood the invitation

to be personal rather than business related. Likewise, Ponce's contact person with Customer B asked him to follow up with her to let her know "where he landed." Customer C's representative also asked Ponce "to follow up no matter where [he] went."

Before leaving Aerotek, Ponce was instructed to revise a binder of materials with detailed information on all of the customers with whom he had worked. Ponce added detailed handwritten notes to the binder. On cross-examination, Ponce's supervisor at Aerotek admitted such detailed information seemed to be at odds with any intent to steal Aerotek's customers.

Ponce went on vacation to Mexico. On July 24, 2007, Ponce was still in Mexico when he sent an e-mail to the Johnson Group. The Johnson Group is a small staffing company in Sacramento founded by Chris Johnson. It competes with Aerotek. Ponce was hired in August 2007 as the Johnson Group's fourth employee. The Johnson Group already had a large number of environmental and engineering customers, and it was not a condition of employment that Ponce bring any customers from Aerotek. Ponce was also instructed he was not to solicit Aerotek's customers when he made the announcement of his new employment.

Ponce consulted the Sacramento Business Journal and other lists of companies in the area in formulating a list of companies to whom he would announce his new employment. In announcing his new position with the Johnson Group, Ponce visited a number of companies, including Companies A, B, and C. As Ponce testified: "[T]he purpose was just an announcement in general, so if they did not offer business to me like they did not offer it, I never followed up with them again." Ponce further testified he did not solicit business while meeting with representatives of Companies A, B, and C.

### Company A

In August 2007, Ponce had lunch with David L., his contact at Company A. Ponce had befriended David during his time at Aerotek, and they talked "about

6

everything." Ponce announced he was working with the Johnson Group, and David began asking him questions about his new company. Ponce gave David a brochure about the Johnson Group as well as his business card. He denied giving the promotional materials to solicit Company A. Instead, he explained he "had a good relationship with David and wanted to let him know where I ended up." David then asked Ponce to help him fill a position at Company A, which had not previously done business with the Johnson Group.

During defendants' case-in-chief, David testified it was "not a big deal" to go to lunch with Ponce because they did so routinely while Ponce was with Aerotek. David did not remember the exact timing of when Ponce announced he joined the Johnson Group. However, David also did not feel like he was getting "the full court press to come over to the Johnson Group." David did not remember Ponce giving him a brochure. When shown a copy of the Johnson Group brochure, David testified: "I don't recall seeing this."

A copy of the four-page brochure was introduced at trial. It states: "The Johnson, Group, Inc[.] is a dynamic consulting firm specializing in professional recruiting. We partner with many Architecture firms, Engineering firms, Environmental consulting firms, Homebuilders, Developers, and Construction companies in the Sacramento Region and many more nationwide. We make the connection for great placements and great careers. [¶] The Johnson Group, Inc. provides full service recruiting solutions. We offer a variety of hiring methods including Direct Placement, Contract, and Contract-to-Hire. Currently, we specialize in four niche Divisions including, Architecture, Environmental, and Construction Management." The remainder of the brochure enumerates common placement types along with the repeated slogan, "Determined to Deliver." On the last page, the slogan is joined by a small caption that states: "Choose The Johnson Group, Inc."

7

Although David L. found Ponce to be "very friendly" and quick to learn the needs of his business, he "never had a very good working relationship" with O'Brien. Moreover, Company A never "sole sourc[ed]" employees from just one staffing company. Instead, David L. expressly invited Aerotek and the Johnson Group to engage in "some fun," by which he meant a "friendly competition" between the two companies.

Aerotek learned for the first time during the second trial that Company A had been bought out by another company during the time for which Aerotek sought damages.

### Company B

In August 2007, Ponce also met with Alexis M. at Company B. Ponce announced he was working at the Johnson Group. Alexis was already a friend of Chris Johnson's mother, and they talked about her. Alexis then told Ponce, "I have business for both of you." Ponce testified he did not solicit business from Alexis. However, he did give her a brochure and a business card.

Called by the defendants in their case-in-chief, Alexis testified she had worked with Chris Johnson's mother and liked her. When Ponce called to announce he was working with the Johnson Group, she invited him to meet with her. She explained, "I asked him to come out. I wanted to say hi. And I absolutely pursued The Johnson Group business because of my relationship with Caroline [Chris Johnson's mother] and my relationship with Michael [Ponce]. I don't know how to say it other than that." She further testified she was the one to ask Ponce to give her a brochure for the Johnson Group and to send over a sales contract. She added that Ponce did not solicit business from Company B either on the telephone or in person.

Alexis testified O'Brien "knew nothing about [Company B], he knew nothing about what my needs were, and I kind of felt like he had bigger clients, I remember him canceling, I think I remember him canceling a couple of things with me. [¶] I don't – I

don't remember all of the details, but I just remember an overall sense of that my business wasn't as important to him as" it was to Ponce.

Even at the start of the second trial, Aerotek was unaware Company B had closed its local office and Alexis M. moved to a different state to work for a different company.

### *Company C*

Within a week of starting at the Johnson Group, Ponce called Victoria C. at Company C's headquarters in Wisconsin. They began to talk about the fact Victoria's husband had started his own staffing firm. Victoria then offered Ponce business at her firm. Sometime thereafter, Ponce met with Eric V., a local employee of Company C. Ponce announced he was with the Johnson Group, and Eric invited him to talk further in the Company C conference room. Ponce gave a brochure and business card to Eric.

Called by the defendants, Eric testified Ponce called him to announce he was with the Johnson Group. However, Eric did not remember meeting with Ponce. He also did not remember receiving a brochure from Ponce. When shown a copy of the brochure by Aerotek's counsel, Eric did not recognize ever having seen it.

Eric testified his company actually continued to use Aerotek for its staffing needs even after Ponce left Aerotek. Even though Company C did not have an exclusive contract with Aerotek, it did not use the Johnson Group for any temporary or contract placement staff. After 2009, Company C had not used any temporary replacements because the "[e]conomy changed."

Later, during the hearing on the motion for attorney fees, the trial court noted each of the representatives from Companies A, B, and C, said of O'Brien –- Ponce's replacement at Aerotek –- that "we saw that guy. He was aloof. He was self-important. He didn't have time for us. He wouldn't look at us." O'Brien was, in short, a "cold fish" and "[n]obody wanted to talk to him."

### *Aerotek's Attempt to Prove Damages*

Aerotek called David Black, a certified public accountant, who testified Aerotek lost $146,849 in profits due to the misappropriation of Companies A, B, and C. Black estimated the lost profits based on the spread between Aerotek's fixed costs and expected income from Companies A, B, and C. He relied on estimates given to him from Aerotek that were drawn from the period of 2005 to 2006. In 2009 and 2010, Aerotek reduced its estimates "just knowing the economy" at the time. The number of lost placements was based entirely on the estimate provided by Aerotek. However, Aerotek did not survey Companies A, B, and C to ascertain the effect of the downturn in the economy on their staffing needs for the period for which damages were claimed.

Black estimated lost profits of $40,548 for Company A. No one informed Black Company A was no longer in business. Black learned the information about Company A only after defense counsel started cross-examining him during the second trial. The next day, on resumed cross-examination, Black asserted the purchaser of Company A retained the same telephone number and conducted business at the same location. However, Black did not offer any insight into the purchaser company's staffing needs for any time period.

Even though Company B closed its local office in July 2008, Black nonetheless estimated lost profits of $18,561 for damages accruing after 2008. Black admitted if his information from Aerotek was wrong and the local office of Company B closed, no lost profits were to be expected.

Black estimated lost profits of $23,596 due to Company C. His damage estimates assumed Aerotek would actually increase the number of placements to that company.

In addition to Aerotek's lost profits, Black also estimated the amount of unjust enrichment to defendants as a result of the alleged misappropriations. Black used the estimated number of Aerotek's "lost placements" to multiply them by the "spread" –- the

10

expected profit per average placement by the Johnson Group. Even though Black lacked confidence in the estimate, he opined the minimum amount wrongfully gained by the Johnson Group was $130,406.

However, Black acknowledged he had not been told whether the nature of placements at the companies on which Aerotek wished him to focus were "brand-new positions or conversions" –- a distinction that would have affected whether or not Aerotek would have earned a commission. Black's estimated damages were not based on actual invoices but on projections generated by Aerotek. Thus, "the loss period for [20]09, [20]10 is not based on any actual placements that [Black had] been advised The Johnson Group obtained." Moreover, Black assumed the companies at issue would have continued to work with Aerotek without defendants' alleged misappropriation.

Aerotek did not call as a witness a single representative of any company for which it alleged misappropriation. Instead, Aerotek attempted to show both solicitation and causation of damages by relying on the hearsay of its own employee, O'Brien. During the second trial, the following colloquy occurred:

"THE COURT: [Attorney Wiseman (counsel for Aerotek)], I have to interrupt you to ask for, what is it, the fifth time, why don't you bring in [Customer C] or [Customer A] or [Customer B] or whoever else has been the hearer of [Ponce's] or [Johnson's] said solicitation?

"[Wiseman]: Well, Your Honor, I'm entitled –-

"THE COURT: Why don't you do that?

"[Wiseman]: I am entitled to put on the case that my client wants to put on and –-

"THE COURT: You are entitled to put it on within the rules of evidence. Just because your client wants it in the record does not mean it is going in."

Later, the trial court again admonished Aerotek's counsel as follows:

11

"Q. [Aerotek's co-counsel, Crews, directed to Mike O'Brien]: [C]an you characterize for me how those conversations went?

"[Defendants' counsel, Calnero]: Objection.

"THE COURT: [Counsel], what is it that I have to tell you to get you to leave this area of inquiry. I have said you can't bring to this jury out of court statements. Those customers are not here in front of us. You could have subpoenaed those customers, [Counsel] and put them here on the stand and everybody could have been listening to them and then they could have been cross-examined. Absent that, having declined to do that, you can't bring it in through some other witness. You can't do it by what they said, what they looked [at], how they felt, how he felt, how –- what the generic -- where are you going with this [Counsel]? [¶] I am ordering you to leave this area of inquiry because there is nothing that you can bring in that is allowed by the hearsay rules of evidence."

### *Verdict and Judgment*

The jury returned verdicts in favor of the Johnson Group and Ponce. Specifically, the jury found defendants did not misappropriate any of Aerotek's trade secrets, and Ponce did not breach the nondisclosure agreement. The trial court entered judgment on the verdicts. Aerotek appealed, and this court affirmed the judgment in *Aerotek I, supra,* C067652.

### *Award of Attorney Fees to Defendants*

While the appeal of *Aerotek I* was pending, defendants moved for attorney fees under section 3426.4. Aerotek opposed the motion. A hearing on the motion commenced July 15, 2011, and was resumed on October 21, 2011. In January 2012, the trial court issued a statement of decision in which it awarded $735,781.27 in attorney fees to defendants.

12

The trial court based the attorney fees on its finding Aerotek's action was objectively specious and brought in subjective bad faith within the meaning of section 3426.4. The trial court stated that, at the outset of the litigation, "[n]either Aerotek management nor its counsel sought out the customers in question to inquire as to the exact nature of the contact by Ponce, whether by conducting official interviews, obtaining affidavits or taking depositions. Instead, Santich, the manager at the time, sent out a lower-level staff person who made only minimal inquiries."

The trial court also recounted that "[a] key turning point in the Second Trial was when Defendants put on several of the said customers who had spoken with both Ponce and his successor at Aerotek. 'Cold fish,' 'arrogant,' [']dis-interested' were some of the adjectives used to describe Ponce's successor at Aerotek. None expressed any interest in continuing to do business with Aerotek, either through the new representative, or otherwise. [¶] Nor did Aerotek or its counsel find out what reason, if any, such customers had for failing to continue to do business with Aerotek, following Ponce's departure. 'Victim of the business downturn,' 'our company got bought out and moved out of the area,' 'we didn't need any new hires from anyone -- we'd laid off all of our help' were several of the answers that were available to Aerotek and its counsel, *but apparently they found out such reasons only at the Second Trial.*" (Italics added.)

The trial court additionally found "[f]urther acts by Aerotek evidencing objective speciousness argued by Defendants include –-

"Unreasonable and escalating settlement demands. As Aerotek's case got weaker, either due to failure to find favorable evidence, or the appearance of adverse evidence, including losing against [the Johnson Group] at the First Trial, its settlement demands got larger, not smaller;

13

"Demanding a 'Hands Off' list as part of settlement, which list contained any number of companies that it either had never done business with, or had, but only distantly, or were [the Johnson Group]'s existing business;

"Failing to 'whittle down' the list of customers, the contact by Ponce of which Aerotek sought to be actionable, until months or years past the time when such customers were patently not protectable by Aerotek. At the outset of the case, Aerotek alleged that Ponce had solicited 65 of its client[s], and still maintained an interest in 37 different clients at its opening settlement demand. But at the First Trial, they could only point to five customers, and by the Second Trial, they could offer proof on only three.

"Maintaining the lawsuit well after Aerotek knew, or should have known, that the customers it was attempting to exclude from defendants had little or no business of any economic consequence to either Aerotek or [the Johnson Group], meaning that its damages, assuming it could prove liability, would be insignificant.

"Continuing to demand that [the Johnson Group] refrain from hiring any further Aerotek employees, which is something they never pled in the lawsuit, nor could they ever have obtained under the laws of this state."

The trial court also found Aerotek had an anti-competitive motive in suing defendants, noting that "[a]mple evidence . . . came into the trial of statements made by Aerotek personnel to the effect that they were going after Chris Johnson and [the Johnson Group] for competing with them and had a goal of shutting down [the Johnson Group]'s ability to have competed with them. Insisting on anti-competitive conditions as terms . . . for settling this lawsuit, as described above, further points toward the anti-competitive motivation for the lawsuit."

Moreover, the trial court explained: "The simple fact that defendants are seeking over one half million dollars in legal fees, together with the fact that [Aerotek] had to have spent even more than that sum speaks volumes about the aggressiveness with which

14

[Aerotek] prosecuted this case." Moreover, "[t]he record is replete with vast numbers of motions brought, both in Law & Motion and in the trial courts, in conducting this case, largely for non-substantive issues. Doing so, however, in the absence of the kind of meaningful discovery or other helpful fact-gathering, speaks further to a pattern of conducting expensive proceedings for their own sake, without a commensurate effort to pursue productive preparation of the case."

As to the lodestar amount, the trial court explained it heard testimony that "the number of hours worked times the uncontested rates, came to $535,219." Based on the quality of advocacy for the defense, the extent to which the litigation precluded other work by the attorneys, and the risk incurred by defense counsel, the court applied a multiplier on the lodestar amount of 1.33. Thus, the trial court awarded $735,781.27 in attorney fees to the defendants.[5]

DISCUSSION

I

### Whether Aerotek's Action Was Brought in Bad Faith within the Meaning of Section 3426.4

Aerotek argues the trial court abused its discretion in awarding attorney fees to defendants. Specifically, Aerotek contends its misappropriation of trade secrets action against the defendants was neither objectively specious nor brought in subjective bad faith. We are not persuaded.

A.

### Attorney Fees Under Section 3426.4

To establish misappropriation of trade secrets under the UTSA, a plaintiff has the burden to prove "(1) the plaintiff owned a trade secret, (2) the defendant acquired,

---

[5]     This amount does not appear to include any costs.

15

disclosed, or used the plaintiff's trade secret through improper means, and (3) the defendant's actions damaged the plaintiff." (*Sargent Fletcher, Inc. v. Able Corp.* (2003) 110 Cal.App.4th 1658, 1665, citing inter alia, § 3426.1.) Section 3426.4 provides that "the court may award reasonable attorney's fees and costs to the prevailing party" when "a claim of misappropriation is made in bad faith." Section 3426.4, however, does not define "bad faith" in providing for fee shifting. (*JLM Formation, Inc. v. Form+Pac* (N.D. Cal. 2004) 2004 WL 1858132, *1 (*JLM Formation*).)

To apply section 3426.4's fee shifting provision, courts have developed a two-prong test requiring: "(1) objective speciousness of the claim, and (2) subjective bad faith in bringing or maintaining the action, i.e., for an improper purpose. (*Gemini Aluminum Corp. v. California Custom Shapes, Inc*. (2002) 95 Cal.App.4th 1249, 1262 (*Gemini*).) Section 3426.4 authorizes the trial court to award attorney fees as a deterrent to specious trade secret claims. (95 Cal.App.4th at p. 1261.) Because the award is a sanction, a trial court has broad discretion in awarding fees. (*Id*., at p. 1262.) On appeal from such an order, the appellant has an 'uphill battle' and must overcome both the 'sufficiency of evidence' rule and the 'abuse of discretion' rule." (*FLIR Systems, Inc. v. Parrish* (2009) 174 Cal.App.4th 1270, 1275-1276 (*FLIR Systems*) fn. omitted.) Thus, " ' "[i]n reviewing the facts which led the trial court to impose sanctions, we must accept the version thereof which supports the trial court's determination, and must indulge in the inferences which favor its findings. [Citations.]" [Citation.]' (*Gemini, supra,* 95 Cal.App.4th at pp. 1262–1263.)" (*FLIR Systems, supra,* at p. 1278.)

## B.

### *Objective Speciousness*

As to the first prong of the test for an award of attorney fees under section 3426.4, "[o]bjective speciousness exists where the action superficially appears to have merit but there is a complete lack of evidence to support the claim. (*Gemini, supra*, 95 Cal.App.4th

at p. 1261; *CRST Van Expedited, Inc. v. Werner Enterprises* (9th Cir.2007) 479 F.3d 1099, 1112.)" (*FLIR Systems, supra,* 174 Cal.App.4th at p. 1276.) More specifically, an objectively specious action includes cases in which plaintiff "lacks proof as to one of its essential elements." (*JLM Formation, supra,* 2004 WL 1858132, *2, citing *Stilwell Development, Inc. v. Chen* (C.D.Cal.1989) 1989 WL 418783, *4 (*Stilwell Development*).) As recognized in *Gemini Aluminum Corp. v. California Custom Shapes, Inc*. (2002) 95 Cal.App.4th 1249, 1261 (*Gemini*), the Legislature intended the fee shifting provision of section 3426.4 to deter specious misappropriation actions. "In order to be deterrable, a trade secret claim must involve conduct more culpable than negligence; it must be 'at least reckless or grossly negligent, if not intentional and willful.' " (*JLM Formation*, *supra*, 2004 WL 1858132, *1, quoting *Stilwell Development, supra,* 1989 WL 418783, *3.)

Here, the first trial concluded with the jury finding that even though defendants misappropriated Aerotek's customer information, the misappropriation was not a substantial factor in causing Aerotek *any* harm. As Aerotek acknowledges, the lack of success in proving damages caused the company "to emphasize its alternative 'unjust enrichment' measure of recovery at the second trial."[6]

During the second trial, the jury found defendants did not violate the UTSA when Ponce visited representatives of Companies A, B, and C.[7] (*Aerotek I, supra,* C067652.)

---

[6]    Although Aerotek sought damages for lost profits and for unjust enrichment, Aerotek now focuses exclusively on unjust enrichment.

[7]    In the prior appeal, Aerotek did not challenge the jury's verdict. Instead, Aerotek argued the trial court erred (1) by refusing to grant Aerotek's motion for directed verdict, and (2) by instructing the jury that an otherwise lawful announcement of new employment to a former employer's customers may be made in writing, by telephone, or in person. (*Aerotek I, supra,* C067652.) We rejected the contentions and affirmed the judgment. (*Id.*)

17

Finding no misappropriation, the second jury did not address whether defendant had been unjustly enriched.

In its statement of decision awarding attorney fees, the trial court rejected Aerotek's evidence of causation and damages as follows: "The Court was frankly embarrassed for [Aerotek's] experts' testimony; from the looks on the faces of the jurors, they also felt chagrin or worse over the vacuous, simplistic or evasive answers both experts gave on cross examination. [Black], a forensic accountant, admitted that his analysis of Aerotek's lost profits was solely based on the opinion of one of its employees. [Ward] admitted that he didn't know that Ponce could 'announce' his new place of employment and further, that he'd done no independent fact gathering, but depended entirely upon the self-serving information fed to him by Aerotek."

Aerotek bases its unjust enrichment theory of damages on its assertion it did not have to prove the misappropriation caused Aerotek to sustain lost profits. Although true, the assertion does not help Aerotek on the issue of unjust enrichment. "A plaintiff seeking a money judgment . . . as a remedy for unjust enrichment need only establish *a causal connection* between the wrongful conduct and the profits to be disgorged." (*Uzyel v. Kadisha* (2010) 188 Cal.App.4th 866, 892, italics added.) Here, Aerotek did not prove causation or damages for unjust enrichment.[8]

Aerotek attempts to rehabilitate its expert witnesses on causation and damages by noting Ward only testified during the first trial, and asserting Black's "expert testimony is

---

[8] As we have noted, Aerotek failed to establish any wrongful conduct by the Johnson Group or Ponce during the second trial. And, as the granting of the motion for new trial indicates, the jury in the first trial was confused. However, the lack of success in establishing misappropriation does not serve as a basis for our conclusion the action was objectively specious because Aerotek did have some evidence as to this element of its claim.

entirely distinguishable from the expert used in *FLIR Systems*, who opined that the former employees would be unable to form a new company without eventually using the employer's trade secrets -- which was a frivolous assertion given California law's previous rejection of the inevitable disclosure doctrine." In Aerotek's view, Black's sole reliance on an Aerotek employee's information to calculate damages is excusable because Black relied on the Johnson Group's financial data in calculating the scope of unjust enrichment. However, Aerotek's attempt to rehabilitate Black's testimony as sufficient avoids discussing Black's surprise that Customer A had been bought out by another business. Unaware of Customer A's cessation of business, Black necessarily would not have known what staffing needs it (or any successor business) had during the period for which Aerotek sought damages. Black was also unaware Customer B was not doing business during the period for which he calculated damages, even though he admitted no lost profits could be expected if the customer had no local office. The testimony of Customer C's representative established it actually continued to do business with Aerotek and did not use the Johnson Group for placement of temporary or contract staff. Thus, the Johnson Group could not have been unjustly enriched by Customer C.

Aerotek also did not establish evidence of lost profits. The expert testimony on this point was –- according to the trial court –- an embarrassment, not the type of evidence characterizing a nonspecious but unsuccessful claim. Equally importantly, the same gaps in causation that defeated Aerotek's claims of unjust enrichment precluded any permissible conclusion defendants were responsible for the loss of business with Companies A and B. As the testimony of Company A and B representatives established, they did not want to work with O'Brien after Ponce's departure from Aerotek. As to Company C, it continued to do business with Aerotek.

"In reviewing the facts which led the trial court to impose sanctions, we must accept the version thereof which supports the trial court's determination, and must

19

indulge in the inferences which favor its findings." (*Gemini, supra*, 95 Cal.App.4th at pp. 1262–1263.) Without credible expert testimony to establish lost profits or unjust enrichment, Aerotek was unable to support any claim of damages. For lack of evidence going to damages and causation, Aerotek's claim was objectively specious.

Aerotek also asserts the trial court "inexplicably ignore[d]" Aerotek's unjust enrichment theory in the statement of decision awarding attorney fees. However, Aerotek neither develops an argument on this point nor does it cite any legal authority to establish reversible error. Accordingly, any argument on this point is forfeited. "When a point is asserted without argument and authority for the proposition, 'it is deemed to be without foundation and requires no discussion by the reviewing court.' " (*In re S.C.* (2006) 138 Cal.App.4th 396, 408, quoting *Atchley v. City of Fresno* (1984) 151 Cal.App.3d 635, 647.)

Aerotek also quotes a snippet of the trial court's statement of decision stating: "Here, there was little evidence of actual damages." Aerotek reasons if there was "little evidence," the standard of objective speciousness cannot be met. We are not persuaded. First, Aerotek takes the phrase out of context. The trial court's statement was made as part of its finding that Aerotek had an anti-competitive motive. The court explained: "Here, there was little evidence of actual damages, no persuasive evidence of misappropriation and no threat of imminent harm, as shown by Aerotek's failure to seek immediate injunctive relief. Ample evidence, however, came into trial of statements made by Aerotek personnel to the effect that they were going after Chris Johnson and [the Johnson Group] for competing with them." This statement does not undermine the trial court's earlier finding of objective speciousness. Nor does it revitalize the testimony of Aerotek's damages expert.

For lack of credible evidence on causation and damages, the trial court correctly concluded Aerotek's action was objectively specious.

20

## C.

### *Subjective Bad Faith in Intending to Harass and Bankrupt the Defendants*

The second prong of the test for attorney fees under section 3426.4 requires the misappropriation of trade secrets claim to have been brought with subjective bad faith. (*Sargent Fletcher, Inc. v. Able Corp.*, *supra,* 110 Cal.App.4th at p. 1665.) "Subjective bad faith may be inferred by evidence that appellants intended to cause unnecessary delay, filed the action to harass respondents, or harbored an improper motive. (*Gemini, supra,* 95 Cal.App.4th at p. 1263.)" (*FLIR Systems, supra,* 174 Cal.App.4th at p. 1278.)

Improper motives include bringing an action for the purpose of harassing the opposing side or to eliminate business competition. (*Gemini, supra,* at p. 1263; *FLIR Systems, supra,* at p. 1285.) "Similar inferences [of subjective bad faith] may be made where the plaintiff proceeds to trial after the action's fatal shortcomings are revealed by opposing counsel." (*FLIR Systems, supra,* 174 Cal.App.4th at p. 1278.) Consistent with *Gemini* and *FLIR Systems*, we observe the well-established dichotomy between objective lack of legal merit and subjective motive.

Evidence of improper motive has long been considered an element of subjective bad faith for statutes awarding attorney fees in meritless actions. For attorney fees to be awarded under section 3426.4, the *Gemini* court held subjective bad faith may be shown by evidence of improper motive. To this end, "if the [trial] court determines that a party had acted with the intention of causing unnecessary delay, or for the sole purpose of harassing the opposing side, the improper motive has been found, and the court's inquiry need go no further." (95 Cal.App.4th at p. 1263, citing *Summers v. City of Cathedral City* (1990) 225 Cal.App.3d 1047, 1072.) The *Summers* court surveyed the requirements for sanctions premised on frivolous appeals (Code Civ. Proc., § 907) and for sanctions premised on frivolous actions in the trial court (Code Civ. Proc., § 128.5). (*Summers, supra,* 225 Cal.App.3d at pp. 1072-1073.) Even though the tests differ in whether they

21

require both objective meritlessness and improper motive or only one of the two prongs, improper motive is analytically juxtaposed against objective frivolousness. (*Ibid.*) Likewise, in *In re Marriage of Flaherty* (1982) 31 Cal.3d 637, the California Supreme Court held that "an appeal should be held to be frivolous only when it is prosecuted for an improper motive -- to harass the respondent or delay the effect of an adverse judgment -- *or* when it indisputably has no merit -- when any reasonable attorney would agree that the appeal is totally and completely without merit." (*Id.* at p. 650, italics added.)

Nonetheless, the *FLIR Systems* court reasoned that "[o]bjective speciousness was established by evidence that appellants had an anticompetitive motive in filing the lawsuit." (174 Cal.App.4th at p. 1276.) Though the *FLIR Systems* court used improper motive as part of its objective speciousness analysis, it nonetheless acknowledged that "[s]ubjective bad faith may be inferred by evidence that appellants . . . harbored an improper motive." (174 Cal.App.4th at p. 1278.) Accordingly, we proceed to consider the evidence supporting the trial court's finding of anti-competitive motive by Aerotek under our analysis of whether this action was brought in subjective bad faith.

The trial court found Aerotek acted in subjective bad faith by intending the lawsuit to harass and financially bankrupt the defendants. The trial court's statement of decision noted the "statements made by Aerotek personnel to the effect that they were going after Chris Johnson and [the Johnson Group] for competing with them and had a goal of shutting down [the Johnson Group]'s ability to have competed with them. Insisting on anti-competitive conditions as terms for settling this lawsuit . . . further points toward the anti-competitive motivation for the lawsuit."

The trial court's finding is supported by the record. In support of defendants' motion for attorney fees, a former recruiter for Aerotek, James Cameron, declared that "it was clear to me that Aerotek generally, and O'Brien and Santich specifically, were very angry at [the Johnson Group] and Johnson for taking business away from Aerotek. [¶]

22

. . . In fact, while on the way to lunch sometimes in or around the spring of 2007, Santich, [fellow Aerotek employee Ken] Ramey, several other recruiters and myself were on the way to lunch. In response to one of the employee's questions about the status of the lawsuit against [the Johnson Group] and Johnson, Santich remarked that 'he didn't know why Johnson was not settling the First Lawsuit.' Santich went on to state, that if Johnson did not settle the lawsuit, 'he [Johnson] better have deep pockets,' indicating Aerotek's intent to out-spend Johnson in the continued litigation. This and various other statements made by Santich and O'Brien while I still worked at Aerotek indicated to me that Aerotek's intent was to bury Johnson and [the Johnson Group], regardless of the merit, or lack thereof, of any lawsuit. From these conversations, my understanding of Aerotek's general corporate sentiment was to shut [the Johnson Group] down. There were several meetings during my continued employment in which Santich stated that Aerotek would pursue litigation against employees like Johnson who left to compete with Aerotek."

Like Ponce, Johnson himself was once an Aerotek employee. He declared that when he left the company, Aerotek's then vice-president Todd Moore called his cell phone and told Johnson: "[H]ow dare you go out and compete against your friends." Moore added, " 'you better believe that we [Aerotek] are going to come after you,' or words very close to that."

Although Aerotek's opening brief objects to reliance on a hearsay "statement made to Johnson by an unnamed person" as violating the holding in *Markley v. Beagle* (1967) 66 Cal.2d 951, Aerotek provides no reasoned argument or citation to challenge the declarations provided by Cameron and Moore. (*In re S.C.*, *supra*, 138 Cal.App.4th at p. 408 [undeveloped arguments lacking legal authority are appropriately deemed forfeited].) Aerotek cannot incorporate an evidentiary challenge made in the trial court by merely citing its briefs filed below. "[I]ncorporation of trial court arguments in an appellate brief

23

is inappropriate." (*Banning v. Newdow* (2004) 119 Cal.App.4th 438, 455.) In any event, the record supports the trial court's finding of anti-competitive motive.[9]

## II

### *Whether the Trial Court Abused its Discretion in Determining the Lodestar Multiplier*

Aerotek contends defendants' award of attorney fees under section 3426.4 "was procured through misrepresentation." Specifically, Aerotek argues that "in connection with Porter Scott's later motion to have that law firm's name added as listed payee of the attorneys' fee award, it was disclosed that, in truth, Porter Scott decided to handle the case without charge to defendants, not for some altruistic, public policy consideration, but because of a self-interested risk management concern -- to settle a potential malpractice claim that defendants had threatened to bring against Porter Scott." (Italics

---

[9] We also note the trial court found that "[a]t the outset of the case, Aerotek alleged that Ponce had solicited 65 of its client[s], and still maintained an interest in 37 different clients at its opening settlement demand. But at the First Trial, they could only point to five customers, and by the Second Trial, they could offer proof on only three." Even as its case crumbled, Aerotek "[c]ontinu[ed] to press unrealistic or unreasonable settlement demands as its case lost value and/or steam." Aerotek also continued "to demand that [the Johnson Group] refrain from hiring any further Aerotek employees, which is something they never pled in the lawsuit, nor could they ever have obtained under the laws of this state."

This observation is supported by the record. Before the first trial, Aerotek's settlement demand was $173,000. This demand represented its estimate of damages for misappropriation of 65 companies. After the first trial yielded an award of only $40,000 for breach of contract, Aerotek's settlement demand increased to $174,500. After Aerotek *lost* at the second trial, its settlement demand remained essentially the same: $167,000. Significantly, Aerotek's settlement demand following the first trial exceeded the amount Aerotek would argue constituted the amount of damages for unjust enrichment. Aerotek also continued to demand "a lengthy hands-off client list" that included companies that had already been clients of the Johnson Group before Ponce joined the new recruiting company.

omitted.)  Thus, Aerotek reasons the trial court's lodestar multiplier was unwarranted.
We disagree.

## A.

### *Cognizability*

At the outset, we note defendants contend this issue is not cognizable because it refers to matters occurring after entry of the order being appealed.  Thus, defendants point out Aerotek filed a notice of appeal that specifies only the February 8, 2012, order awarding attorney fees under section 3426.4.  However, Aerotek subsequently filed another notice of appeal from the amended order awarding defendants (including Porter Scott) attorney fees under section 3426.4.  The second notice of appeal resulted in this court's assignment of the same appellate case number.

Aerotek is not foreclosed in claiming error based on the trial court's reasoning as demonstrated by proceedings leading up to and including the amended order for attorney fees for which the second notice of appeal was filed.  With a properly filed notice of appeal, a "reviewing court may review the verdict or decision and any intermediate ruling, proceeding, order or decision which involves the merits or necessarily affects the judgment or order appealed from."  (Code Civ. Proc., § 906; *In re Marriage of Macfarlane & Lang* (1992) 8 Cal.App.4th 247, 252.)  Thus, we consider the argument on the merits.

## B.

### *Lodestar Multiplier*

To determine whether the trial court was misled in determining the lodestar multiplier, we start with the proper procedure for determining the reasonable amount of attorney fees.  The award of fees "is governed by equitable principles.  (*PLCM Group, Inc. v. Drexler* (2000) 22 Cal.4th 1084, 1094–1095 (*PLCM*).)  The first step involves the lodestar figure -- a calculation based on the number of hours reasonably expended

multiplied by the lawyer's hourly rate. 'The lodestar figure may then be adjusted, based on consideration of factors specific to the case, in order to fix the fee at the fair market value for the legal services provided.' (*Id*. at p. 1095.) In short, after determining the lodestar amount, the court shall then ' "consider whether the total award so calculated under all of the circumstances of the case is more than a reasonable amount and, if so, shall reduce the [attorney fee] award so that it is a reasonable figure." ' (*Id*. at pp. 1095–1096, quoting *Sternwest Corp. v. Ash* (1986) 183 Cal.App.3d 74, 77.) The factors to be considered include the nature and difficulty of the litigation, the amount of money involved, the skill required and employed to handle the case, the attention given, the success or failure, and other circumstances in the case. (*PLCM* at p. 1096.) The 'necessity for and the nature of the litigation' are also factors to consider. (*Kanner v. Globe Bottling Co*. (1969) 273 Cal.App.2d 559, 569 [appellate court affirmed award of fees reduced by trial court].)" (*EnPalm, LCC v. Teitler* (2008) 162 Cal.App.4th 770, 774 (*EnPalm*).)

## C.

### *Aerotek's Challenge to the Lodestar Multiplier*

Here, the trial court applied a multiplier on the lodestar amount of 1.33. In its statement of decision, the trial court explained the lodestar multiplier was based on the following factors: (1) the issues at trial presented challenging and difficult areas of the law; (2) the skill displayed in the written work and oral presentations by Porter Scott attorneys, including their courtesy, respect, and restraint in the face of unseemly tactics employed by Aerotek's counsel; (3) the work on the case prevented Porter Scott from taking on other work during the time it devoted to defending the present action; and (4) the risk that Porter Scott incurred. On the risk incurred by Porter Scott, the trial court found: "Porter Scott's decision to continue to represent Defendants after Defendants clearly had no ability to fund the aggressive lawsuit, arguably lethal, in its consequences

26

to their business, in which they found themselves effectively converted this case to a contingency arrangement. . . .  Representing a client who is a *defendant* in a lawsuit on a contingency basis . . . is virtually unheard of. . . .  Along these lines, the court wishes not to ignore the representation that [Calnero] billed none of his time spent in the conduct of the First Trial, electing instead simply to bill the time of a second associate in the case."

On appeal, Aerotek asserts Porter Scott misled the trial court in moving for attorney fees because Porter Scott did not represent defendants pro bono or for altruistic reasons but only to escape the threat of a malpractice lawsuit.  This assertion is unsupported by the record and, even if true, does not undermine the factors relied upon by the trial court to award a multiplier on the lodestar.

Aerotek misstates the record insofar as it claims it discovered the malpractice threat after the order awarded fees to defendants under section 3426.4.  In moving for attorney fees, Calnero –- counsel for defendants -– submitted a declaration showing Aerotek was already alleging the malpractice threat story during the first trial:

"As Defendants have previously advised this Court, commencing in approximately December 2009, Porter Scott took on representation of Defendants on a pro bono, rather than paid, basis.  In response, Aerotek asserted that this was done by Porter Scott as 'risk management.'  Specifically, Aerotek stated 'Tacitly acknowledging their need to take appropriate risk management measures based on their prior advice, on Friday, December 4, 2009, Porter Scott wrote to Judge Chang that they had apparently "resolved" Defendants' payment issues and abruptly decided to take this case on a *pro bono* basis through trial.  [Citation.]  The fact that Porter Scott would "resolve" (or perhaps excuse) a six figure debt _and_ take the case on pro bono underscores the strength of Aerotek's position . . . .'  . . . [¶]  . . . Indeed, Aerotek even had the gall to propound a discovery request seeking to 'Produce any insurance policies, including any policies

covering legal malpractice which might provide coverage for any claims made or asserted by ANY OF THE DEFENDANTS in this action."

Porter Scott also submitted, in support of the motion for attorney fees, a letter to Aerotek's counsel, which stated: "In response to Request for Production, Number 102 (incorrectly identified by Plaintiff as Number 104), please be advised that no legal malpractice claim has occurred arising from this firm's representation of The Johnson Group. Your insinuation of such through your attempt to obtain any existing legal malpractice insurance policies is ludicrous."

Calnero's declaration further noted the trial court had admonished Aerotek's counsel during the first trial for insinuating a malpractice claim by the defendants, stating: "There is only one way that utterance could be interpreted, and that is to suggest that Porter Scott committed malpractice in representation of the defendants from which they were trying to avoid consequences. This, in the face of absolutely no evidence in the record in this case. There is nothing to suggest in the record of this case, in the handling of this case, in the administration of the case that Porter Scott did other than a competent, workmanlike job in representing his clients. So that was a gratuitous, offensive, insulting remark that had no place, I have to say again, in this case."

The trial court expressly addressed Aerotek's contention regarding the new discovery that Porter Scott had filed a misleading motion for fees when the trial court granted Porter Scott's motion to be added as a creditor. Not only did the trial court not credit Aerotek's contention, but it disallowed Aerotek from being involved as a party in a hearing to determine the apportionment of the fees between defendants and Porter Scott.

Aerotek's briefing continues to insinuate Porter Scott represented defendants without charge only upon threat of legal malpractice. However, the record shows that when defendants ran out of funds for litigation designed by Aerotek to be bankrupting, Porter Scott agreed to continue to represent defendants upon the conditions they (1) pay

28

$25,000, (2) release Porter Scott from any liability in connection with the representation, and (3) agree Porter Scott would at least share in any recovery of attorney fees from Aerotek. The record contains no suggestion defendants ever actually threatened to sue Porter Scott for malpractice.

More importantly, Aerotek's claim of a malpractice settlement does not undermine the trial court's rationale for the lodestar multiplier. It is undisputed Porter Scott provided successful pro bono representation that resulted in a defense verdict we ultimately upheld on appeal. (*Aerotek I, supra,* C067652.) Even if defendants had threatened to sue Porter Scott for malpractice, that firm incurred a risk in continuing its legal work that is properly the subject of a lodestar multiplier of 1.33. (*EnPalm, supra,* 162 Cal.App.4th at p. 774.) Accordingly, we reject Aerotek's contention as unsupported by the record and irrelevant to the propriety of the trial court's reasoning in determining the amount of attorney fees to be awarded.

### III

### *Attorney Fees on Appeal*

Defendants and real party in interest request that we award attorney fees to them for the appeal. " '[I]t is established that fees, if recoverable at all -- pursuant either to statute or [the] parties' agreement -- are available for services at trial and on appeal.' " (*Gemini, supra,* 95 Cal.App.4th at pp. 1264, quoting *Marcos v. Board of Retirement* (1990) 51 Cal.3d 924, 927.) As in the trial court, defendants have prevailed on appeal and are entitled to fees under section 3426.4. " 'Although this court has the power to fix attorney fees on appeal, the better practice is to have the trial court determine such fees.' " (*Gemini*, *supra*, 95 Cal.App.4th at pp. 1264-1265, quoting *Security Pacific National Bank v. Adamo* (1983) 142 Cal.App.3d 492, 498.) Accordingly, we remand the matter to allow the trial court to assess the amount of reasonable attorney fees for defending the trial court's order under section 3426.4.

29

DISPOSITION

The judgment is affirmed.  Defendants (the Johnson Group Staffing Company, Inc., and Michael Ponce) and real party in interest (Porter Scott) are awarded reasonable attorney fees and costs on appeal in an amount to be determined by the trial court on noticed motion.  (Cal. Rules of Court, rule 8.278(a)(1) & (2); Civ. Code, § 3426.4.)


          HOCH        , J.


We concur:


        MAURO         , Acting P. J.


        MURRAY       , J.