Filed 3/25/15  Marriage of Safaie and Khashayar CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| In re the Marriage of ROKSANA SAFAIE and ALI KHASHAYAR. | |
| ROKSANA SAFAIE,<br><br>        Respondent,<br><br>v.<br><br>MAJID SALIM,<br><br>        Appellant. | A139941, A140795<br><br>(Contra Costa County<br>Super. Ct. No. D93-04344) |

Roksana Safaie filed a request for an order to set aside the judgment in her divorce proceeding.  Safaie alleged her former husband, Ali Khashayar, had owned substantial real property in the nation of Iran during their marriage, of which she became aware only long after the end of the marriage.  In addition, Safaie alleged Khashayar had transferred the proceeds from sales of these properties to his brother, Golamreza, and his brother's son, appellant Majid Salim, and she joined Golamreza's estate and Salim as parties to the dissolution proceeding.  Following their joinder, Safaie sought and was granted three separate awards of pendente lite attorney fees against Salim under Family Code section 2030.

Salim contends the family court erred in awarding attorney fees because Safaie was required, and failed, to demonstrate a likelihood of success on her claims against him.  While we reject this legal contention, we agree Safaie was required to provide some evidence to connect Salim to her claims of misappropriated community property.

Finding no potentially admissible evidence in Safaie's submissions to support a finding Salim had received community or quasi-community property, we reverse.

## I. BACKGROUND

In July 2012, Safaie filed a request for an order to set aside the judgment of dissolution of her marriage to Khashayar on grounds of fraud and misappropriation of quasi-community assets. In a declaration submitted with the request, Safaie explained she and Khashayar were married in Iran in the 1960's. At some point, they emigrated to the United States, and they divorced in 1987, when Khashayar decided to return to Iran. In 1991, they reconciled and remarried, but Safaie obtained a default judgment of dissolution in 1993. At the time, Safaie believed the only asset of the community was a family home in Lafayette.

In January 2012, Safaie stated, Khashayar was deposed in a lawsuit filed by her brother, Reza. A portion of what purports to be the deposition transcript was attached to Safaie's declaration. In it, Khashayar states that he gave $144,000 to Reza at an unspecified time while he was married to Safaie. The source of a portion of the funds was the sale of a house in Iran owned by Khashayar and Safaie that they had "both lived in." The date of the sale is not stated in the deposition. The remainder of the money paid to Reza came from money Khashayar had saved during the marriage from bonuses he earned at work. Khashayar claimed to have told Safaie about some, but not all, of this money. In her declaration, Safaie characterized the family home in Iran sold by Khashayar as "quasi-community property" and states he admitted having sold it "without my knowledge or consent." In fact, the deposition is silent as to Safaie's knowledge and consent to the sale.

According to Safaie's declaration, during the period 1970–1985, Khashayar purchased four properties in Iran that, Safaie estimated, were valued at nearly $2 million. Again, Safaie was unaware of the transactions. The claim is supported by what purport to be translations from the Farsi language of three real estate sales contracts for Iranian property in which Khashayar was listed as the buyer. Although the documents are accompanied by a translator's certification, they are not authenticated in any manner.

2

There is also a purported translation of a grant deed reflecting a sale of property by Khashayar in Iran in 1989, and a similar sales contract, again not authenticated, about which Safaie states she was unaware.

Safaie's declaration states that Khashayar was convicted of fraud and theft in Iran and "has systematically transferred his assets to third parties for the express purpose of defrauding creditors. I believe this to be true as well as various witnesses have submitted declarations stating that he has, in fact, told him [*sic*] that he has transferred money to third parties. Specifically, [Khashayar] transferred, literally, millions of dollars to [Salim] and [Golamreza], now deceased. [Khashayar] has admitted, repeatedly, to witnesses that [Salim] is in possession of his assets, some of which may be misappropriated quasi-community funds . . . . I am informed and believe that [Salim] was formerly a dishwasher at my brother's restaurant. He is now the owner of a large and valuable Chevrolet dealership in San Francisco and has millions of dollars of cash in his bank accounts." The paragraph containing this language ends with a citation to "Exhibit 8," attached to the declaration. Although this exhibit appears to have been intended to provide evidentiary support for the statements in this paragraph, none of the documents in exhibit 8 are explained or authenticated in any way.

Among other documents, exhibit 8 contains what purport to be English translations of unsworn statements prepared in Farsi by Safaie's sisters, Afsaneh and Azar. Afsaneh's statement says her father owned substantial real estate in Iran at the time of the Islamic Revolution in 1979. Her father emigrated to America, where he learned in the early 1990's that Khashayar had fraudulently sold his properties. After her father returned to Iran to investigate in 1993, he obtained a warrant for Khashayar's arrest. Afsaneh's father died in Iran in 1994. When Afsaneh traveled to Iran to investigate, Khashayar admitted to Afsaneh both murdering her father and stealing his real estate. Khashayar told Afsaneh he had given the money to Golamreza, Salim, and Salim's sisters, who were in America. Azar's statement explained her understanding of the manner in which Khashayar had defrauded her father, stating he was assisted by Golamreza. According to Azar, Khashayar and Golamreza "transferred millions of

dollars of stolen properties to the account of [Salim]" and other family members. Khashayar then returned to the United States, "put all the stolen properties under his daughter's and [Salim's] name," and filed for bankruptcy. There is no indication in these statements or in Safaie's declaration of the circumstances of their creation, including the place and time of their purported execution. Although Afsaneh's statement says she is "back from Iran," there is no explanation why she did not provide an actual declaration.

In response, Khashayar filed a declaration in which he stated, among other things, Safaie was aware of the real estate transactions that had occurred in Iran during their first marriage and she received her share of the proceeds at the time of their first divorce. Khashayar also said he had declared bankruptcy in order to escape harassment by Safaie's family and claimed the present request was an attempt to extend the harassment to Golamreza's family. Khashayar attached the translation of a document stating he had been acquitted on appeal of the criminal charges brought in Iran.

In September 2012, Safaie joined Salim and Golamreza's estate as parties to the dissolution proceeding. The complaint for joinder alleged Salim and his father's estate were joined for the purpose of investigating transfer to them of misappropriated community and quasi-community property by Khashayar. The joinder was granted.

In November 2012, Safaie requested an award of $15,000 in pendente lite attorney fees from Salim. The request was accompanied by a declaration reiterating in a conclusory manner the charges made in the documents initially submitted by Safaie, as well as an income and expense declaration. No further evidence of Salim's involvement was provided.

In opposition, Salim submitted a declaration claiming Safaie's proceeding was an attempt to recover for a debt discharged by Khashayar in bankruptcy and her brother was financing the proceeding. Submitted with an attorney's declaration was a complaint filed against Salim and others by Safaie's brother in August 2012, based on claims generally similar to those of Safaie. Although Salim submitted an income and expense declaration, it was largely incomplete, save for the acknowledgement of monthly dividend or interest income of $8,456 and some expenses.

4

The family court granted the request to the extent of awarding $12,000 in fees. A portion of the fees were allocated to compensate for past services, while the remainder was to be "placed in trust to be used to pay attorney fees reasonably related to [Safaie's] action involving [Salim]." At the hearing on the request, the court explained it was accepting the various documents submitted by Safaie in connection with her original filing as offers of proof, and it made a finding "there is a reasonable likelihood" Safaie would prevail in her claims against Salim. The court described the finding as "a relatively minimal threshold," equivalent to the conclusion Safaie "would be able to develop admissible evidence to support [her] claim."

Safaie filed a second request for attorney fees in June 2013, based on the same evidentiary submissions. In granting the fee request after a September hearing, the family court noted there was a dramatic conflict in the evidence, with allegations of "lying, forging documents, all kinds of things." The court declined to speculate about "who's going to win," but it held, "if I need to make a finding that [Safaie's claim] is not specious, I would make the finding that based on what I have before me I do not believe her claim is specious." The court awarded a further $30,000 in attorney fees, but it reserved jurisdiction to "reallocate fees" under Family Code section 271, if Salim ultimately prevailed or if the court was persuaded Safaie had sufficient financial resources, contrary to her claims.

In December 2013, Safaie filed a third request for attorney fees from Salim, seeking an additional $50,000, again without further evidentiary support for her claims. Salim again opposed the request, arguing, among other grounds, a further award of attorney fees should await the results of a trial of the validity of Safaie's claims against Khashayar, scheduled for March 2014. The family court awarded a further $30,000, to cover the retention of appellate counsel and work regarding the claim against Salim.

Salim appealed from both the September and December 2013 attorney fees orders, and the appeals were consolidated by our order of February 27, 2014.

5

## II. DISCUSSION[1]

Family Code section 2030 provides: "In a proceeding for dissolution of marriage, . . . and in any proceeding subsequent to entry of a related judgment, the court shall ensure that each party has access to legal representation, . . . by ordering, if necessary based on the income and needs assessments, one party . . . to pay to the other party, or to the other party's attorney, whatever amount is reasonably necessary for attorney's fees and for the cost of maintaining or defending the proceeding during the pendency of the proceeding." (*Id.*, subd. (a).) When the "other party" is a third party to the marriage, any award of attorney fees "shall be limited to an amount reasonably necessary to maintain or defend the action on the issues relating to that party." (*Id.*, subd. (d).)

"The purpose of an attorney fees award in a marital dissolution proceeding is to provide, as necessary, one of the parties with funds adequate to properly litigate the matter. [Citation.] The party seeking an award of need-based attorney fees has the burden of establishing need. [Citation.] [¶] In deciding whether to award attorney fees, the trial court considers the parties' respective needs and incomes, including their assets and liabilities. [Citations.] A motion for attorney fees is left to the trial court's sound discretion and will not be disturbed on appeal absent a clear showing of abuse." (*In re Marriage of Bendetti* (2013) 214 Cal.App.4th 863, 868 (*Bendetti*).)

The availability of pendente lite attorney fees from third parties in a marriage dissolution proceeding was first addressed by *In re Marriage of Siller* (1986)

---

[1] As an initial matter, Safaie contends the family court's orders were not appealable because the court reserved jurisdiction to reallocate fees under certain conditions. As Safaie acknowledges, pendente lite awards of attorney fees in dissolution proceedings are ordinarily appealable. (*In re Marriage of Tharp* (2010) 188 Cal.App.4th 1295, 1311.) The authority cited by the family court for reallocation of fees, Family Code section 271, is "in the nature of a sanction." (*Id.*, subd. (a).) As Salim correctly argues, the family court would be permitted to "reallocate" fees under section 271, regardless of whether it specifically reserved jurisdiction to do so, if it deemed the statutory requirements met. The court's unnecessary reservation of jurisdiction did not prevent its orders from being considered final for purposes of appeal. (See generally *Tharp*, at pp. 1316–1317.)

187 Cal.App.3d 36 (*Siller*), which considered a statutory predecessor to Family Code section 2030. The wife in *Siller* joined her husband's business entities as third parties in a dissolution proceeding, alleging the business entities held community property assets. (*Id.* at pp. 41–42.) Midway through the litigation, she sought an award of attorney fees against the entities, which had filed several motions. (*Id.* at p. 42.) The court held pendente lite attorney fees were available from any party to a dissolution proceeding, assuming the statutory requirements were satisfied. (*Id.* at p. 44.) In a portion of the decision particularly applicable here, the court rejected the business entities' substantive due process objections to the award of fees. The entities argued it was unfair to award fees merely because they were in a more favorable financial position than the wife, without considering the validity of her claims. The court found it "immaterial" whether the wife was likely to prevail because (1) her claims were not "specious" and (2) the family court had awarded fees to compensate the wife's attorneys' work only in connection with motions and writ petitions on which the wife had prevailed, thereby demonstrating it was "reasonable" for her to "mount a defense" to those actions. (*Id.* at p. 53.) Although the court did not define its use of the term "specious," it explained its conclusion by noting the wife had presented evidence supporting a conclusion her claims were valid and did, in fact, prevail on some of her factual claims at trial. (*Ibid.*)

The holding of *Siller* was reaffirmed and extended by *Bendetti,* in which the wife joined the husband's second wife as a party to the dissolution proceedings, alleging the second wife had participated in a fraudulent transfer of the husband's assets. (*Bendetti*, *supra*, 214 Cal.App.4th at pp. 866–867.) The wife was granted substantial pendente lite attorney fees against the second wife, over the objection her complaint in joinder was a sham. (*Id.* at p. 867.) On appeal, the second wife contended a spouse seeking attorney fees against a third party in a dissolution proceeding was required to make a prima facie case and demonstrate a likelihood of success. (*Id.* at p. 868.) In affirming the award of fees, the court followed *Siller* in holding "there is no requirement that a party to a dissolution proceeding demonstrate a likelihood that he or she will prevail in his or her claim against a third party to be entitled to attorney fees pendente lite." (*Bendetti*, at

p. 871.) The court did, however, conduct a cursory analysis of the evidence presented with respect to the second wife's involvement, concluding the wife's claims were not specious because she had made "a prima facie showing that [the second wife] had a connection to an issue in the dissolution proceeding." (*Ibid.*) The conclusion was based on statements by the husband during a deposition, which the court found "sufficient to establish that there were 'issues' in the dissolution proceeding that related to [the second wife]." (*Ibid*.)

Notwithstanding the holdings of both *Siller* and *Bendetti*, Salim argues Safaie was required to demonstrate a likelihood of success in order to receive an award of pendente lite attorney fees. We need not resolve this issue—although we note it is soundly rejected in both *Siller* and *Bendetti*—because we conclude Safaie failed to satisfy even the minimal evidentiary standard established in those cases.[2] (*Bendetti, supra*, 214 Cal.App.4th at p. 871.) "[N]ot specious," the showing suggested by *Siller* and adopted by *Bendetti*, is not a traditional evidentiary standard. Its current closest analog is the standard for bad faith in connection with an award of attorney fees under the Uniform Trade Secrets Act (Civ. Code, § 3426 et seq.), which requires a showing of "objective speciousness" to support an award. In that context, speciousness is defined to exist "where the action superficially appears to have merit but there is a complete lack of evidence to support the claim." (*FLIR Systems, Inc. v. Parrish* (2009) 174 Cal.App.4th 1270, 1276.) In other words, to demonstrate a lack of speciousness a party is required only to present some evidence to demonstrate the potential validity of his or her claims. This standard was reflected in *Bendetti*'s conclusion that a claim is demonstrated not to be specious when the petitioner makes "a prima facie showing that [the third party] had a connection to an issue in the dissolution proceeding." (*Bendetti, supra*, 214 Cal.App.4th

---

[2] In making this evaluation, we rely only on the evidence available to the trial court in connection with Safaie's requests for attorney fees. At oral argument, Safaie's attorney referred to revelations that were purportedly made in depositions. Because we have not found any reference to those depositions in the appellate record, we do not consider counsel's representations about their content.

at p. 871.) In this connection, "some evidence" necessarily means either admissible evidence or evidence in the form of sworn written testimony that, if provided in court, would constitute admissible evidence.[3] Inadmissible hearsay and unsworn statements are simply not "evidence."

The only support provided by Safaie for her claim that Salim received the proceeds from community property or quasi-community property assets were the two unsworn, undated, and unauthenticated statements purportedly from her sisters. Even these statements do not tie Salim directly to the proceeds of community property or quasi-community property assets, since the events to which they refer appear to relate to property acquired by Khashayar after the second divorce; they merely permit the inference Khashayar had engaged in a similar practice earlier.

While Safaie's declaration does testify in a conclusory manner to Khashayar's transfer of assets, this testimony appears to be based entirely on the accounts of unidentified other persons. Safaie states merely that she "believe[s]" these claims to be true, and there is no explanation for her belief other than a reference to "declarations" by "various witnesses," none of whom were identified. She also refers to admissions by Khashayar of such transfers, but all such admissions appear to have been made to other, unspecified persons, not to Safaie. In short, she does not support her testimony in the declaration with any facts that would permit the conclusion she had personal knowledge of the matters asserted. Safaie therefore provided no actual evidence of a connection between Salim, Khashayar, and the disposition of community property or quasi-community property assets.

In granting Safaie's requests for fees, the family court concluded she had met her evidentiary burden because her submission suggested she "would be able to develop admissible evidence to support [her] claim." While, as discussed above, the evidentiary

---

[3] In *Siller*, the trial court had the benefit of a full trial in making its evidentiary evaluation. While the nature of the wife's evidentiary submission was unclear in *Bendetti*, the court specifically referred to transcripts of the deposition of the husband in concluding an adequate evidentiary showing had been made.

showing necessary to support an award of attorney fees against a third party is minimal, it does require the presentation of some admissible, or potentially admissible, evidence to connect the third party to issues in the proceeding. The possibility of developing such evidence is simply not enough. Accordingly, the family court abused its discretion in applying an improper evidentiary standard when evaluating Safaie's requests. Because Safaie failed to satisfy that standard, the family court's challenged orders must be reversed.

## III. DISPOSITION

The family court's orders of September and December 2013, awarding pendente lite attorney fees against Salim, are reversed.

                                                  _____

                                                  Margulies, Acting P.J.

We concur:

_____

Dondero, J.

_____

Banke, J.